1    Matthew C. Helland, CA State Bar No. 250451
2    helland@nka.com
     NICHOLS KASTER, LLP
3    One Embarcadero Center, Suite 720
     San Francisco, CA  94111
4    Telephone: (415) 277-7235
     Facsimile: (415) 277-7238
5

6    Kai Richter, MN Bar No. 0296545*
     G. Tony Atwal, MN Bar No. 0331636*
7    *(**pro hac vice** applications forthcoming)
     NICHOLS KASTER, PLLP
8    4600 IDS Center
     80 South 8th Street
9    Minneapolis, MN  55402
     Telephone: (612) 256-3200
10    Facsimile: (612) 215-6870

11

     Attorneys for Plaintiff and the Putative Classes
12

              **IN THE UNITED STATES DISTRICT COURT**
13               **NORTHERN DISTRICT OF CALIFORNIA**

14

15    Arley and Valerie Leghorn, as individuals, as
     representatives of the classes, and on behalf of    **CLASS ACTION COMPLAINT FOR**
16    the general public,    **DAMAGES, RESTITUTION AND**
                              **INJUNCTIVE RELIEF**
17                  Plaintiffs,

18       vs.    **(1) Breach of Contract**

19    Wells Fargo Bank, N.A., Wells Fargo    **(2) Breach of the Covenant of Good Faith**
     Insurance, Inc., QBE Insurance Corporation,       **and Fair Dealing**
20    and QBE First Insurance Agency, Inc.,
                             **(3) Violation of California's Unfair**
21                  Defendants.       **Competition Law (Business &**
                              **Professional Code § 17200 *et seq*.)**
22

                              **(4) Unjust Enrichment/Restitution**
23

                              **DEMAND FOR JURY TRIAL**
24

25

26

27

28

                            CLASS ACTION COMPLAINT

ORIGINAL
FILED

FEB 1 9 2013

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

KAW

C 13 0708

Plaintiffs Arley and Valerie Leghorn ("Plaintiffs"), on behalf of themselves and the putative classes set forth below, and in the public interest, bring the following Complaint against Defendants Wells Fargo Bank, N.A. ("WFB") and Wells Fargo Insurance Inc. ("WFI") (collectively, "Wells Fargo"), and QBE Insurance Corporation ("QBEC") and QBE First Insurance Agency, Inc. ("QBEF") (collectively, the "QBE Defendants").

### PRELIMINARY STATEMENT

1.      Plaintiffs and the putative class members have mortgages[1] secured by residential property, and were charged for lender-placed (also known as "force-placed") flood insurance.

2.      Although mortgage lenders and servicers generally have the right to force-place flood insurance where the property securing the loan falls in a Special Flood Hazard Area ("SFHA") and is not insured by the borrower, WFB systematically abused that right and violated the legal rights of Plaintiffs and other Putative Class members by (1) purchasing backdated policies, (2) charging borrowers for expired or partially expired coverage, and (3) arranging for kickbacks or so-called "commissions" for itself and/or its affiliates in connection with force-placed flood insurance.

3.      WFI actively participated in this unlawful and unfair scheme by (1) procuring backdated force-placed flood insurance coverage for WFB; and (2) accepting kickbacks or so-called "commissions" from the QBE Defendants and other entities for such backdated coverage (a portion of which were passed on to WFB).

4.      The QBE Defendants also actively participated in this unlawful and unfair scheme. QBEC issued backdated force-placed flood insurance coverage for WFB that was wholly or partially expired, and received handsome premium payments for such backdated coverage. QBEC, in turn, shared a portion of these premiums with its affiliate, QBEF, which won Wells Fargo's business by offering kickbacks or so-called "commissions" on force-placed flood insurance policies to WFB's affiliate, WFI. But for these kickbacks, the QBE Defendants would not have won Wells Fargo's force-placed flood insurance business.

---

[1] As used herein, the term "mortgages" includes deeds of trust and other security instruments.

CLASS ACTION COMPLAINT

5.     Defendants engaged in this conduct in bad faith, knowing that their actions were not authorized by borrowers' mortgage contracts or the National Flood Insurance Act ("NFIA"), and were inconsistent with applicable law and reasonable commercial standards of decency and fair dealing.

6.     Based on this conduct, Plaintiffs assert claims herein for (1) breach of contract (against WFB); (2) breach of the covenant of good faith and fair dealing (against WFB), (3) unjust enrichment/restitution (against WFI, QBEC, and QBEF); and (4) violation of California's Unfair Competition Law ("UCL"), Business and Professional Code § 17200 *et. seq.* (against all Defendants).

7.     Plaintiffs assert these claims on behalf of five proposed classes and three proposed subclasses of borrowers, as defined below in Paragraphs 58 through 65 (the 'Putative Classes').[2]

8.     Plaintiffs and the Putative Classes seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Defendants' unlawful and unfair conduct, as described herein.

## THE PARTIES

9.     Individual and representative Plaintiffs Arley and Valerie Leghorn reside in San Mateo, California, and are members of each of the Putative Classes defined below.  Plaintiffs' residential property in San Mateo, California was the subject of the force-placed flood insurance coverage described herein.

10.     Defendant WFB is a national banking association, legally headquartered in Sioux Falls, South Dakota.  WFB is engaged in the business of mortgage lending and servicing, and does business in the State of California and throughout the United States.  WFB services mortgages through its Wells Fargo Home Mortgage division.

11.     Defendant WFI is an affiliate of WFB, and is based in St. Louis Park, Minnesota. During the relevant time period, WFI arranged for force-placed flood insurance coverage for

---

[2] The term "Putative Classes" refers to both the proposed classes and subclasses.  Plaintiffs reserve the right to amend their proposed class definitions or to propose other or additional classes (or subclasses) in their class certification motion, after having an opportunity for discovery.

-2-

1    WFB through the QBE Defendants and other entities, and received kickbacks or so-called

2    "commissions" from QBEF on such force-placed flood insurance coverage.

3        12.    Defendant QBEC is headquartered on Wall Street Plaza in New York City.  QBEC

4    issues force-placed flood insurance policies for numerous mortgage lenders and servicers, and

5    collects and retains premiums payments in connection with such policies.  The flood insurance

6    policies that Wells Fargo force-placed on Plaintiffs' property were issued by QBEC.

7        13.    Defendant QBEF is headquartered in Atlanta, Georgia.  During the relevant time

8    period, QBEF arranged for mortgage lenders and servicers (including WFB) to purchase force-

9    placed flood insurance from QBEC, and received a portion of the premiums paid on each force-

10   placed policy.  In addition, QBEF tracked and monitored the portfolios of various mortgage

11   lenders and servicers (including WFB) for flood insurance coverage.  Consistent with this

12   business arrangement, QBEF tracked and monitored flood insurance coverage for Plaintiffs'

13   property, and force-placed coverage on Plaintiffs' property through QBEC (with the approval and

14   consent of Wells Fargo).

15                              **JURISDICTION AND VENUE**

16       14.    This Court has original jurisdiction under the Class Action Fairness Act

17   ("CAFA"), 28 U.S.C. § 1332(d)(2).  Plaintiffs are citizens of the State of California, and

18   Defendants are citizens of different states.  The amount in controversy in this action exceeds

19   $5,000,000, and there are more than 100 members of each of the Putative Classes.

20       15.    Venue is proper in the United States District Court, Northern District of California,

21   pursuant to 28 U.S.C. § 1391.  Plaintiffs reside in this District, Defendants regularly conduct

22   business in this District, and Plaintiffs' property is located in this District.

23                              **INTRADISTRICT STATEMENT**

24       16.    Pursuant to L.R. 3-2(c) and (d), this action is properly assigned to the San

25   Francisco Division of the Northern District of California because a substantial portion of the

26   events giving rise to the dispute occurred in San Mateo, California.

27

28

CLASS ACTION COMPLAINT

## FACTUAL ALLEGATIONS

**Origination and Servicing of Plaintiffs' Mortgage Loan**

17.    On or about December 15, 2008, Plaintiffs obtained a mortgage loan from Wachovia Mortgage, FSB ("Wachovia") in the amount of $417,000, secured by a deed of trust on their homestead in San Mateo, California. *See Exhibit 1.*

18.    WFB acquired Wachovia on or about December 31, 2008, and is the current lender-in-interest to Plaintiffs' mortgage.  Plaintiffs' mortgage loan is serviced through Wells Fargo Home Mortgage, which is a division of WFB.  *See supra* at ¶ 10.

**Flood Insurance Requirements for Plaintiffs' Property**

19.    Under the NFIA, lenders are required to ensure that any improved property in a special flood hazard area ("SFHA") that secures a loan or line of credit is covered by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act ($250,000), whichever is less. 42 U.S.C. § 4012a(b)(1).

20.    In the event that the required amount of insurance is not maintained, the NFIA authorizes mortgage lenders and servicers to purchase flood insurance for the borrower in the required amount.  *See* 42 U.S.C. § 4012a(e)(1)-(2).  However, the NFIA does not authorize lenders to purchase backdated insurance coverage for periods of time that already have expired, and does not authorize lenders and servicers to enrich themselves by accepting kickbacks or commissions (either directly or through their affiliates) in connection with force-placed policies.

21.    Similarly, Plaintiffs' deed of trust allows the lender to force-place flood insurance if Plaintiffs fail to maintain the amount of coverage required by the lender.  *See Exhibit 1, ¶ 5.* However, it does not state that WFB may purchase backdated insurance coverage, does not state that WFB may arrange for kickbacks, commissions, or other compensation for itself or its affiliates in connection with force-placed flood insurance coverage, and does not give WFB the right to engage in the other conduct alleged herein.  To the contrary, Plaintiffs' deed of trust provides that:

- Lender may only "do and pay for whatever is reasonable and appropriate" to protect its interest in the property (*Exhibit 1, ¶ 9*);
- "Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law" (*Exhibit 1, ¶ 14*); and
- "All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law." (*Exhibit 1, ¶ 16*).

**Wells Fargo Repeatedly Force-Placed Backdated Coverage through the QBE Defendants**

22.     At the time Plaintiffs originated their mortgage loan with Wachovia, their property was located in a SFHA and they were required to maintain flood insurance on their property. However, on October 16, 2012, the Federal Emergency Management Agency ("FEMA") implemented a map revision for the San Mateo area.  As a result of this map revision, Plaintiffs' property no longer falls within a SFHA, and flood insurance is no longer required for their property.

23.     From the date that they originated their mortgage loan (December 15, 2008) through the date of this map revision, Plaintiffs continuously maintained $250,000 worth of flood insurance coverage on their property.  This amount of coverage is sufficient to meet the requirements of the NFIA and WFB,[3] and throughout this time period, WFB (or its predecessor, Wachovia) was identified as an insured mortgagee under Plaintiffs' flood insurance policies.

24.     WFB had notice of this flood insurance coverage.  However, in spite of this flood insurance coverage for Plaintiffs' property, WFB sent Plaintiffs a form letter ("Binder Letter") on January 30, 2012, claiming that "you do not have insurance" and "[y]our mortgage documents permit us to purchase insurance at your expense[.]"  *See Exhibit 2.*[4]  In this Binder Letter, WFB advised Plaintiffs that it had procured a flood insurance binder for Plaintiffs' property through QBEC, for a 90-day period beginning December 12, **2009** (over two years before the date of the notice).  This coverage was completely worthless because Plaintiffs suffered no flood losses and

---

[3] WFB does not require flood insurance coverage in excess of $250,000.

[4] This form letter and the other form letters described in Paragraphs 25 through 29 were physically sent by QBEF on behalf of WFB with Wells Fargo Home Mortgage letterhead.

-5-

had no flood-related claims for the covered period, and the coverage was expired long before it was ever purchased.

25.    On March 6, 2012, WFB sent another form letter to Plaintiffs ("First Policy Letter"), indicating that WFB had purchased a one-year flood insurance policy for their property from QBEC, for the period from December 12, **2009** to December 12, **2010**. *See Exhibit 3.*  Once again, this coverage was completely worthless because Plaintiffs suffered no flood losses and had no flood-related claims for the covered period, and the coverage expired more than a year before it was ever purchased.

26.    The premium for this expired coverage was $2,250.  In the First Policy Letter, WFB stated that the cost of this policy "will be charged to your escrow account" and "[y]our monthly mortgage payment will be increased to include the cost of this policy."  *Id.*[5]  In addition, WFB also stated:

> The insurance we purchased was obtained with the assistance of Wells Fargo Insurance, Inc., a licensed insurance agency and affiliate of Wells Fargo Bank, N.A.  Wells Fargo Insurance will receive a commission on the insurance we obtained.

*Id.*

27.    On March 7, 2012 – the very next day after WFB force-placed this one-year policy on Plaintiffs' property – WFB sent Plaintiffs another form letter ("Expiration Letter") claiming that Plaintiffs' flood insurance coverage had expired on December 12, 2010.  *See Exhibit 4.*  In this letter, WFB threatened to force-place another flood insurance policy on Plaintiffs' property, despite the fact that WFB already had evidence of such coverage.  *Id.*

28.    The following month, on April 6, 2012, WFB sent Plaintiffs yet another form letter ("Second Policy Letter"), indicating that WFB had purchased another backdated flood insurance policy for their property from QBEC, for the period from December 12, **2010** to December 12,

---

[5] Plaintiffs did not have an escrow account at the time WFB imposed this charge on them. Instead, WFB opened an escrow account in Plaintiffs' name, debited the force-placed insurance charges, and sought to recover the charges from Plaintiffs by building in escrow charges to their monthly mortgage payment.

**2011**. *See Exhibit 5.* Like the earlier policy, this flood insurance policy was completely worthless because Plaintiffs suffered no flood losses and had no flood-related claims for the covered period, and the coverage had expired before it was ever purchased.

29.     The premium for this expired coverage was $2,375. In the Second Policy Letter, WFB once again stated that: (1) the cost of this policy "will be charged to your escrow account" (2) "[y]our monthly mortgage payment will be increased to include the cost of this policy"; and (3) "Wells Fargo Insurance will receive a commission on the insurance we obtained." *Id.*

**Plaintiffs' Repeated Efforts at Resolution**

30.     Plaintiffs repeatedly objected, both verbally and in writing, to WFB's efforts to force-place flood insurance on their property.

31.     On March 12, 2012, Ms. Leghorn spoke with a customer service representative (Art Amaya), who confirmed that WFB had proof of insurance for Plaintiffs' property. However, the following day, WFB sent Plaintiffs a "Notice Concerning Flood Insurance Inquiry," which failed to address their concerns and simply stated that "you must maintain flood insurance on your home." *See Exhibit 6.*

32.     On March 19, 2012, Ms. Leghorn sent a letter of protest to WFB, formally disputing WFB's efforts to force place backdated flood insurance coverage on Plaintiffs' property. *See Exhibit 7.* In this letter, the Leghorns stated that "we believe [this] falls under the category of unfair, deceptive, or abusive acts or practices[,]" and cited statutory and regulatory support for their position. *Id.* Shortly thereafter, on April 2, 2012, the Leghorns provided WFB with evidence of flood insurance coverage for their property. *See Exhibit 8.* However, WFB still did not reverse the charges for the first force-placed policy, and proceeded to force-place the second flood insurance policy on April 6, 2012.

33.     Utterly exasperated, Ms. Leghorn contacted WFB again on April 11, 2012. During this telephone call, Ms. Leghorn spoke with a customer service representative (Cassandra), who confirmed that WFB did have a record of Plaintiffs' flood insurance coverage in its database. However, the representative stated that WFB had misplaced the physical policy documents and could not locate them. Accordingly, the Leghorns faxed evidence of their flood

1    insurance coverage directly to her, in an effort to resolve the situation.

2        34.    More than five weeks later, on May 17, 2012, QBEC sent Plaintiffs a letter stating

3    that the first force-placed flood insurance policy had been cancelled, and that Plaintiffs' loan

4    would be credited $2,250.  However, the charges for the second force-placed policy have never

5    been refunded.    To the contrary, WFB increased Plaintiffs' monthly mortgage payment

6    obligation, effective November 1, 2012, from $2,302.69 to $2,500.61 (an increase of $197.92), to

7    make up for an alleged "shortage" in their escrow account attributable to the force-placed

8    insurance charges.  When Plaintiffs tendered their normal mortgage payment (in the amount of

9    $2,302.69), WFB failed to apply it to their loan balance.  Instead, WFB notified Plaintiffs on

10   December 11, 2012 that their payment had been diverted to an "unapplied funds account."  *See*

11   *Exhibit 9.*

12       35.    On December 18, 2012, the Leghorns sent another letter of protest to WFB,

13   objecting to WFB's backdated force-placed flood insurance coverage, and WFB's efforts to extort

14   payment for this force-placed coverage by increasing Plaintiffs' mortgage payments and refusing

15   to accept normal payments in the ordinary course of business.  *See Exhibit 10.*  In this letter, the

16   Leghorns stated that "we are exhausted from fighting with Wells Fargo over this issue[,]" and

17   indicated that they intended to seek legal intervention if the matter was not resolved.  *Id.*

18   However, WFB still failed to resolve the situation.  Instead, WFB sent Plaintiffs a form letter on

19   December 20, 2012 indicating that their property was at risk of a "foreclosure sale" (*see Exhibit*

20   *11*), even though they always had been current on their monthly mortgage payments.

21       36.    On December 28, 2012, the Leghorns sent another letter of protest to WFB.  *See*

22   *Exhibit 12.*  At the same time, the Leghorns tendered the additional mortgage payment amount

23   demanded by WFB in order to protect their good credit and save their home from foreclosure.

24   Plaintiffs' payment of this additional amount was anything but voluntary.  In their letter, Plaintiffs

25   expressly advised WFB that "[w]e will be filing a civil action to seek reimbursement of these

26   funds and ensure that the improperly placed flood insurance issue is finally resolved."  *Id.*

27       37.    On January 10, 2013, Plaintiffs filed an action against WFB in small claims court

28   in San Mateo County, and served WFB with a copy of their Complaint.  However, the following

day, on January 11, 2013, WFB sent Plaintiffs a letter continuing to maintain that Plaintiffs were responsible for the remainder of the alleged escrow shortage.[6]

38.     As of the date of this Complaint, Plaintiffs have voluntarily dismissed their small claims court action against WFB without prejudice.  Plaintiffs bring this putative class action lawsuit in this Court order to ensure that *all* persons affected by Defendants' unlawful force-placed insurance scheme receive proper remuneration, and to prevent Defendants from continuing to engage in their unlawful scheme.

**Backdating Insurance Policies Is Unfair, Unjust, and Unlawful**

39.     It was unfair, unjust, and unlawful for Defendants to impose backdated force-placed flood insurance on Plaintiffs.

40.     As Ms. Leghorn noted in her March 19, 2012 letter to WFB (*Exhibit 7*), the practice of backdating insurance has been condemned by the National Association of Insurance Commissioners ("NAIC").  According to the NAIC, insurance is "prospective in nature" and policies "should not be back-dated to collect premiums for a time period that has already passed." *See Exhibit 13 at 2.*

41.     As Ms. Leghorn further explained in her March 19, 2012 letter, retroactively force-placing flood insurance policies also is inconsistent with the advance notice requirements of the NFIA.  *See* 42 U.S.C. § 4012a(e).  As the Office of the Comptroller of the Currency ("OCC") has stated:

> The ability to impose the costs of force placed flood insurance on a borrower
>
> commences 45 days after notification to the borrower of a lack of insurance or of

---

[6] In this letter, WFB indicated that it would not refund the second force-placed policy because Plaintiffs allegedly had not provided evidence of coverage for the period from December 12, 2010 - December 12, 2011.  However, as noted above, Plaintiffs continuously maintained flood insurance coverage on their property during this period, and WFB's customer service representatives previously conceded that WFB had a record of Plaintiffs' flood insurance coverage for this period, even though the declarations pages had been misplaced.  If WFB had timely requested evidence of coverage, instead of waiting more than a year to do so, the declarations page showing coverage for this period would have been readily available.  Moreover, even if Plaintiffs' coverage had lapsed (which it did not), this does not excuse Wells Fargo's efforts to charge Plaintiffs for expired flood insurance coverage that provided no benefit to Plaintiffs or Wells Fargo (aside from the kickbacks that Wells Fargo received on the policy).

1      inadequate insurance coverage.  Therefore, lenders may not charge borrowers for

2      coverage during the 45-day notice period.

3    Flood Insurance Questions & Answers, 74 Fed. Reg. at 35,934.[7]

4         42.    Accordingly, this Court and other courts have upheld claims that backdating

5    force-placed insurance policies is unfair and/or unlawful.  *See, e.g.*, *Ellsworth v. U.S. Bank, N.A.*,

6    -- F. Supp. 2d --, 2012 WL 6176905, at **15-21 (N.D. Cal. Dec. 11, 2012) (finding plaintiff

7    stated valid claims for breach of contract, breach of the covenant of good faith and fair dealing,

8    unjust enrichment, and violation of the UCL based on backdating allegations); *McNeary-*

9    *Calloway v. JPMorgan Chase Bank, N.A.*, 2012 WL 1029502, at ** 5, 23-29 (N.D. Cal. Mar. 26,

10   2012) (finding plaintiff stated valid claims for breach of contract, breach of the covenant of good

11   faith and fair dealing, unjust enrichment, and violation of the UCL based on allegations that the

12   defendant backdated "force-placed insurance policies to cover time periods which had already

13   passed and for which there was already absolutely no risk of loss"); *accord*, *Lass v. Bank of Am.,*

14   *N.A.*, 695 F.3d 129, 138-39 (1st Cir. Sept. 21, 2012) (finding plaintiff stated valid claim for

15   breach of the covenant of good faith and fair dealing based on backdating allegations); *Montanez*

16   *v. HSBC Mortg. Corp. (USA)*, -- F. Supp. 2d --, 2012 WL 2899371, at *6 (E.D. Pa. July 17,

17   2012) (denying defendant's motion to dismiss plaintiff's claim for breach of the covenant of good

18   faith and fair dealing, stating that defendant was "not entitled to use its discretion to … charge

19   plaintiffs for insurance covering periods of time that had passed without damage to the

20   property"); *Williams v. Wells Fargo Bank*, *N.A.*, 2011 WL 4901346, at *2, 4 (S.D. Fla. Oct.

21   14, 2011) (allowing claims for breach of the covenant of good faith and fair dealing and unjust

22   enrichment to proceed where plaintiffs alleged that Wells Fargo "retroactively" purchased

23   "backdated" force-placed policies); *Am. Bankers Ins. Co. v. Wells*, 819 So.2d 1196, 1204 (Miss.

24

---

25   [7] The OCC recently proposed alternative language which would allow lenders to charge
     borrowers for flood insurance coverage during the 45-day notice period, if the borrower has given
26   the lender "express authority" to do so.  *See* Loans in Areas Having Special Flood Hazards;
     Interagency Questions & Answers Regarding Flood Insurance, 76 Fed. Reg. 64,175, 64,180-81
27   (Oct. 17, 2011).  No such "express authority" was granted by Plaintiffs.  In any event, it is clear
     that charging a borrower for coverage (or increased coverage) that is "effective" before the 45-
28   day notice period even begins is inappropriate.

CLASS ACTION COMPLAINT

2001) (plaintiffs stated valid claim that lender breached the covenant of good faith and fair dealing by "[i]llegally backdating worthless insurance coverage").

**Kickbacks in Connection with Force-Placed Insurance Are Unfair, Unjust, and Unlawful**

43.     Defendants' force-placed insurance scheme also was unfair, unjust, and unlawful because it involved the payment of improper kickbacks or so-called "commissions" to WFI, which were then funneled back, in part, to WFB.

44.     WFB admitted in its form letters to Plaintiffs that WFI was paid a commission in connection with Plaintiffs' force-placed flood insurance policies. This "commission" was not legitimately earned, and WFB did not perform services commensurate with the commissions that it received. The so-called "commission" was a simply a kickback, which was designed to (and did) induce Wells Fargo to purchase force-placed flood insurance coverage through the QBE Defendants.

45.     The money flow between the QBE Defendants and Wells Fargo is illustrated (in part) by a chart that was filed in *Williams v. Wells Fargo Bank*, *N.A.*, No. 1:11-cv-21233 (S.D. Fla.). *See Exhibit 14.* As reflected in that chart, QBEC paid approximately 40% of the net written premiums to its affiliate, QBEF, on each force-placed policy. *Id.*[8] QBEF then paid 11% of the net written premiums to WFI. *Id.*

46.     The flow of money did not end there. In connection with Wells Fargo's so-called "soft dollars" program, WFI passed back a substantial portion of the commissions that it received to WFB. According to publicly-filed deposition testimony, the passback of these so-called soft dollars is reflected on the general ledger, and is reported on a "Profitability Passback Report." WFB performed no work in return for these passed back (i.e., kicked back) "commissions."

47.     As a result, each of the Defendants had strong financial incentives to impose force-placed flood insurance on WFB's borrowers, and did so regardless of whether such force-placed coverage was appropriate.

---

[8] Although QBEF received over 40% of the premiums, it bore no risk of loss on the force-placed policies, as it did not issue or underwrite the policies. This compensation far exceeded the value of the work performed by QBEF.

-11-

48.     QBEC received hefty premiums on each force-placed policy, which substantially exceeded the premiums charged by other insurers.  For example, the second force-placed policy that QBEC issued for Plaintiffs' property cost $2,375 (*see Exhibit 5*), even though Plaintiffs were able to obtain the same amount of coverage for their property for only $1,634 (*see Exhibit 8*).

49.     In addition, each of the other Defendants (QBEF, WFI, and WFB) received, either directly or indirectly, outsized "commissions" or kickbacks that were not legitimately earned, and came at the ultimate expense of Plaintiffs and other borrowers who suffered force-placed coverage.

50.     These kickback arrangements are unquestionably unjust.  Numerous courts, including this Court, have found that these types of kickbacks in connection with force-placed insurance give rise to the types of legal claims asserted herein.  *See, e.g.*, *Ellsworth*, 2012 WL 6176905, at **15-21; *McNeary-Calloway*, 2012 WL 1029502, at *23-29; *Lass*, 695 F.3d 139-41; *Casey v. Citibank, N.A.*, -- F. Supp. 2d --, 2013 WL 11901 (N.D.N.Y. Jan. 2, 2013); *Ulbrich v. GMAC Mort, LLC*, 2012 WL 3516499, at **1, 3 (Aug. 15, 2012); *Montanez*, -- F. Supp. 2d --, 2012 WL 2899371, at *6; *Skansgaard v. Bank of America, N.A.*, -- F. Supp. 2d --, 2011 WL 9169945 (W.D.Wash. Oct. 13, 2011); *Williams*, 2011 WL 4901346, at * 2, 4; *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278–79 (S.D. Fla. 2009); *Gipson v. Fleet Mortg. Group*, 232 F. Supp. 2d 691, 707 (S.D. Miss. 2002); *Stevens v. Citigroup, Inc.*, 2000 WL 1848593, at *1, 3 (E.D. Pa. Dec. 15, 2000).

51.     Moreover, the practice of accepting commissions in connection with force-placed flood insurance is inconsistent with the NFIA, which only allows lenders and servicers to "charge the borrower for the cost of premiums and fees *incurred* by the lender or servicer for the loan in purchasing the insurance."  42 U.S.C. § 4012(e)(2); *see also* 12 C.F.R. § 22.3.  To the extent that the lender or servicer receives back a portion of the charges as a kickback, commission, or rebate, such charges are not legitimately incurred and cannot be passed on to the borrower.

52.     On March 14, 2012, Fannie Mae issued a Servicing Guide Announcement ("SGA") pertaining to lender-placed insurance.  *See Exhibit 15.*  In the SGA, Fannie Mae

clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance premiums must **exclude** any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]"  *Id.*  at 4 (emphasis in original).[9]

53.    Earlier that month, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance.  *See Exhibit 16.*[10]  In the RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners."  *Id. at 2.*  In particular, Fannie Mae made the following observations:

- "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

- "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms ....  Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

- "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*Id.*  Accordingly, Fannie Mae stated that it sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners."  *Id. at 3.*  Among

---

[9] The U.S. Department of Housing and Urban Development has promulgated similar guidance in its Lender Manual.

[10] The RFP was labeled "Confidential" by Fannie Mae, but subsequently was published in *American Banker* magazine.  *See* Jeff Horwitz, Fannie Mae Seeks to Break up Force-Placed Market, Document Shows, AMERICAN BANKER, May 24, 2012, *available at* http://www.americanbanker.com/issues/177_101/fannie-rfp-gse-contracting-document-1049630-1.html.

-13-

other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and to "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability." *Id. at 2.*

54.     That same month, on March 14, 2012, the California Department of Insurance ("CA-DOI") announced that it had contacted the ten largest lender-placed insurers in California (including QBE), and asked them to reduce their rates. *See Exhibits 17-18.* In its announcement, the California Insurance Commissioner expressed concern about "questionable financial integration between mortgage lenders and insurers providing 'forced-placed' mortgage insurance." *See Exhibit 17.* In addition, the Commissioner noted a "lack of arm's length transactions between lenders and insurers and, in some cases, a financial relationship between the lender and the insurer" that results in higher premiums and prejudices homeowners.

55.     Two months later, the New York Department of Financial Services ("NYDFS") held an extraordinary three-day public hearing in May 2012 regarding the force-placed insurance practices of several mortgage lenders, servicers, and insurance companies. *See* http://www.dfs.ny.gov/insurance/hearing/fp_052012_schedule.htm. On the opening day of the hearings, NYDFS Superintendent Benjamin Lawsky issued a statement, announcing that "our initial inquiry into the operation of the force placed insurance market has raised a number of serious concerns and red flags." *See Exhibit 19 at 2.* Among other things, Superintendent Lawsky noted that:

> there ... appears to be a web of tight relationships between the banks, their subsidiaries and insurers that have the potential to undermine normal market incentives and may contribute to other problematic practices.  In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work.

*Id.* Superintendent Lawsky further stated that "[t]his perverse incentive, if it exists, would appear to harm both homeowners and investors while enriching the banks and the insurance companies." *Id.* at 3.  Following these hearings, the NYDFS also asked lender-placed insurance companies in

1    New York to submit new rate filings.

2        56.    These concerns are by no means limited to regulators in New York and California.

3    In fact, the National Association of Insurance Commissioners ("NAIC") recently expressed

4    similar "regulatory concern":

5            A key regulatory concern with the growing use of lender-placed

6            insurance is "reverse competition," where the lender chooses the

7            coverage provider and amounts, yet the consumer is obligated to pay the

8            cost of coverage. Reverse competition is a market condition that tends to

9            drive up prices to the consumers, as the lender is not motivated to select

10           the lowest price for coverage since the cost is born by the borrower.

11           Normally competitive forces tend to drive down costs for consumers.

12           However, in this case, the lender is motivated to select coverage from an

13           insurer looking out for the lender's interest rather than the borrower.

14   *Exhibit 20.*

15                          **CLASS ACTION ALLEGATIONS**

16       57.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

17   Rules of Civil Procedure.

18       58    Plaintiffs assert their breach of contract claim (Count 1) and breach of covenant of

19   good faith fair dealing claim (Count 2) against WFB, on behalf of a proposed Fannie Mae

20   Mortgage Class, defined as follows:

21       **Fannie Mae Mortgage Class:** All persons with residential mortgage loans

22       secured by Fannie Mae form mortgages, who were charged by WFB for force-

23       placed flood insurance coverage during the applicable limitations period.

24       59.    To the extent that Plaintiffs' claims in Counts 1-2 are based on allegations of

25   improper backdating, Plaintiffs assert these claims on behalf of a proposed Backdated Fannie

26   Mae Mortgage Sub-Class, defined as follows:

27       **Backdated Fannie Mae Mortgage Sub-Class:** All persons in the Fannie Mae

28       Mortgage Class, who were charged by WFB for backdated force-placed flood

                                    -15-

1    insurance during the applicable limitations period.

2    60.    Plaintiffs assert their UCL claim against Wells Fargo (Count 3) on behalf of a

3    proposed Wells Fargo California Class, defined as follows:

4    **Wells Fargo California Class:** All persons with residential mortgage loans or

5    lines of credit secured by property in the State of California, who were charged by

6    WFB for force-placed flood insurance on or after February 19, 2009.

7    61.    To the extent that Plaintiffs' UCL claim in Count 3 is based on allegations of

8    improper backdating, Plaintiffs assert this claim on behalf of a proposed Wells Fargo Backdated

9    California Sub-Class, defined as follows:

10   **Wells Fargo Backdated California Sub-Class:** All persons with residential

11   mortgage loans or lines of credit secured by property in the State of California,

12   who were charged by WFB for backdated force-placed flood insurance on or after

13   February 19, 2009.

14   62.    Plaintiffs assert their UCL claim against the QBE Defendants (Count 4) on behalf

15   of a proposed QBE California Class, defined as follows:

16   **QBE California Class:** All persons with residential mortgage loans or lines of

17   credit secured by property in the State of California, who were charged for

18   backdated force-placed flood insurance issued by QBEC or its affiliates on or after

19   February 19, 2009.

20   63.    Plaintiffs assert their unjust enrichment/restitution claim against WFI (Count 5) on

21   behalf of a proposed WFI Unjust Enrichment Class defined as follows:

22   **WFI Unjust Enrichment Class:** All persons with residential mortgage loans

23   secured by Fannie Mae form mortgages, who were charged for force-placed flood

24   insurance that was procured by WFI on behalf of WFB during the applicable

25   limitations period.

26   64.    To the extent that Plaintiffs' unjust enrichment/restitution claim against WFI in

27   Count 5 is based on allegations of improper backdating, Plaintiffs assert this claim on behalf of a

28   proposed WFI Unjustly Backdated Sub-Class, defined as follows:

-16-

1     **WFI Unjustly Backdated Sub-Class:** All persons in the WFI Unjust Enrichment

2     Class, who were charged for backdated force-placed flood insurance that was

3     procured by WFI on behalf of WFB during the applicable limitations period.

4     65.     Plaintiffs assert their unjust enrichment/restitution claim (Count 6) against the

5     QBE Defendants on behalf of a proposed QBE Nationwide Class defined as follows:

6     **QBE Nationwide Class:** All persons with residential mortgage loans or lines of

7     credit secured by property in the United States, who were charged for backdated

8     force-placed flood insurance issued by or through the QBE Defendants during the

9     applicable limitations period.

10    66.     Numerosity:   The Putative Classes are so numerous that joinder of all class

11    members is impracticable.   Plaintiffs are informed and believe that thousands of mortgagors

12    satisfy the definition of the Putative Classes.

13    67.     Typicality:     Plaintiffs' claims are typical of the members of the Putative

14    Classes.  Plaintiffs are informed and believe that their mortgage documents are typical of those of

15    other Putative Class members; that the form letters they received are typical of those received by

16    other Putative Class members; that Defendants treated them consistent with other Putative Class

17    members in accordance with Defendants' uniform policies and practices; that it was typical for

18    Wells Fargo to purchase flood insurance through the QBE Defendants; that it was typical for

19    QBEC to issue backdated force-placed flood insurance for WFB and other mortgage lenders and

20    servicers; that it was typical for WFI to earn kickbacks or so-called "commissions" on force-

21    placed flood insurance policies; that it was typical for WFI to pass back a substantial portion of

22    these so-called "commissions" to WFB; and that it was typical for Defendants to engage in the

23    other practices alleged herein.

24    68.     Adequacy:     Plaintiffs will fairly and adequately protect the interests of the

25    Putative Classes, and have retained counsel experienced in complex class action litigation,

26    including litigation relating to force-placed insurance and flood insurance.

27    69.     Commonality: Common questions of law and fact exist as to all members of the

28    Putative Classes and predominate over any questions solely affecting individual members of the

-17-

Putative Classes, including but not limited to:

    a)    whether WFI accepted commissions from QBEF on force-placed flood insurance for WFB borrowers;

    b)    whether WFI passed back a portion of the commissions that it received on force-placed flood insurance coverage to WFB, and if so, what portion or percentage was passed back;

    c)    whether the standard Fannie Mae mortgage form authorizes WFB to charge customers in excess of the net costs incurred by WFB for force-placed flood insurance;

    d)    whether the standard Fannie Mae mortgage form authorizes WFB to charge customers for backdated force-placed flood insurance;

    e)    whether the NFIA authorizes WFB to charge customers in excess of the net costs incurred by WFB for force-placed flood insurance;

    f)    whether the NFIA authorizes WFB to charge customers for backdated force-placed flood insurance;

    g)    whether QBEC issued backdated flood insurance coverage, and QBEF procured backdated flood insurance coverage, for WFB and other mortgage lenders and servicers;

    h)    whether WFB owes its customers a duty of good faith and fair dealing and, if so, whether WFB breached this duty by, *inter alia*, (1) purchasing backdated force-placed flood insurance coverage, at the expense of its customers, for periods that already had expired; and (2) arranging for kickbacks or commissions for itself and/or WFI in connection with force-placed flood insurance;

    i)    whether Wells Fargo's conduct as described herein violates the UCL;

    j)    whether the QBE Defendants' conduct as described herein violates the UCL;

    k)    whether WFI was unjustly enriched by its conduct as described herein;

-18-

l)   whether the QBE Defendants were unjustly enriched by their conduct as described herein;

m)   the appropriateness and proper form of any declaratory or injunctive relief; and

n)   the proper measure of damages and other monetary relief.

70.   This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Putative Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

71.   Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Putative Classes predominate over any questions affecting only individual members of the Putative Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct described in this Complaint stems from common and uniform policies and practices, resulting in unnecessary charges for force-placed flood insurance and related charges that are readily calculable from Defendants' records and other class-wide evidence.  Members of the Putative Classes do not have an interest in pursuing separate individual actions against Defendants, as the amount of each class member's individual claims is small compared to the expense and burden of individual prosecution.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Putative Class members' claims in this forum.

72.   Plaintiffs intend to send notice to all members of the Putative Classes to the extent required by Rule 23.  The names and addresses of the Putative Class members are available from Defendants' business records.

**FIRST CLAIM FOR RELIEF**

**BREACH OF CONTRACT**

**(Asserted against WFB on behalf of the Fannie Mae Mortgage Class and the Backdated Fannie Mae Mortgage Sub-Class)**

73.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

74.     Plaintiffs' deed of trust is a standard Fannie Mae mortgage.

75.     WFB is the lender-in-interest to Plaintiffs' deed of trust and is bound by the terms of their deed of trust.

76.     Plaintiffs' deed of trust does not authorize WFB to purchase backdated flood insurance for periods of time that already have expired, or to charge Plaintiffs for such backdated insurance coverage.

77.     Plaintiffs' deed of trust does not authorize WFB to profit from force-placed flood insurance, or to arrange for kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with force-placed flood insurance.

78.     In these respects, Plaintiffs' deed of trust is typical of the Fannie Mae mortgages securing the property of the other members of the Fannie Mae Mortgage Class and Backdated Fannie Mae Mortgage Sub-Class (collectively referred to herein as the "Fannie Mae Classes").

79.     WFB breached the terms of Plaintiffs' deed of trust and the mortgage agreements of other Fannie Mae Class members by, *inter alia*, (1) charging Plaintiffs and other class members for force-placed flood insurance coverage for periods of time that already had expired, in whole or in part; and (2) arranging for kickbacks, commissions, or other compensation for itself and/or WFI in connection with force-placed flood insurance.

80.     These breaches were willful and not the result of mistake or inadvertence.  WFB knowingly engaged in these breaches to the detriment of Plaintiffs and other Fannie Mae Class members, and knew that its conduct was unlawful.

81.     As a direct result of WFB's breaches, Plaintiffs and the Fannie Mae Classes have been injured, and have suffered actual damages and monetary losses in the form of increased

1 insurance premiums, interest payments, and other charges.

2       82.     Plaintiffs and the Fannie Mae Classes are entitled to recover their damages and

3 other appropriate relief for the foregoing contractual breaches.

4 **<u>SECOND CLAIM FOR RELIEF</u>**

5 **BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**

6 **(Asserted against WFB on behalf of the Fannie Mae Mortgage Class and the Backdated**

7 **Fannie Mae Mortgage Sub-Class)**

8       83.     Plaintiffs allege and incorporate by reference the allegations in the preceding

9 paragraphs.

10       84.     WFB owed Plaintiffs and the Fannie Mae Classes a duty of good faith and fair

11 dealing, by virtue of WFB's contractual relationship with Plaintiffs and the Fannie Mae Class

12 members.

13       85.     WFB breached this duty by, *inter alia*, (1) improperly exercising its purported

14 discretion to force-place flood insurance under the Fannie Mae form mortgage and the NFIA; (2)

15 charging Plaintiffs and other Fannie Mae Class members for backdated force-placed flood

16 insurance coverage for periods of time that already had expired; and (3) arranging for kickbacks,

17 commissions, or other compensation for itself and/or WFI in connection with force-placed flood

18 insurance.

19       86.     WFB willfully engaged in the foregoing conduct in bad faith, for the purpose of

20 (1) unfairly and unconscionably maximizing revenue from Plaintiffs and other Fannie Mae Class

21 members; (2) generating commissions, kickbacks, or other compensation for WFB and/or WFI;

22 (3) forcing Plaintiffs and other Fannie Mae Class members to procure unnecessary and

23 unauthorized insurance; and (4) gaining unwarranted contractual and legal advantages.

24       87.     The foregoing breaches of the implied covenant of good faith and fair dealing were

25 willful and not the result of mistake or inadvertence.  WFB knowingly engaged in this conduct to

26 the detriment of Plaintiffs and other Fannie Mae Class members, knew that its conduct was unfair

27 and unlawful, and engaged in this conduct in bad faith.

28       88.     As a direct result of WFB's breaches of the covenant of good faith and fair

1   dealing, Plaintiffs and the Fannie Mae Classes have been injured, and have suffered actual

2   damages and monetary losses, in the form of increased insurance premiums, interest payments,

3   and other charges.

4        89.    Plaintiffs and the Fannie Mae Classes are entitled to recover their damages and

5   other appropriate relief for the foregoing contractual breaches.

6                            **THIRD CLAIM FOR RELIEF**

7                       **CALIFORNIA UNFAIR COMPETITION LAW**

8                    **California Business & Professional Code § 17200 *et seq.***

9       **(Asserted against WFB and WFI on behalf of the Wells Fargo California Class and the**

10                     **Wells Fargo Backdated California Sub-Class)**

11       90.    Plaintiffs allege and incorporate by reference the allegations in the preceding

12   paragraphs.

13       91.    The UCL prohibits, among other things, any unfair business act or practice.

14       92.    WFB engaged in unfair business practices in violation of the UCL by, among other

15   things:

16       a.   Manipulating the force-placed insurance process;

17       b.   Charging borrowers for backdated force-placed flood insurance coverage;

18       c.   Arranging for kickbacks or so-called "commissions" to be paid to its affiliate,

19            WFI, in connection with force-placed flood insurance; and

20       d.   Arranging for a portion of these kickbacks or so-called "commissions" to be

21            "passed back" to WFB.

22       93.    WFI engaged in unfair business practices in violation of the UCL by, among other

23   things:

24       a.   Manipulating the force-placed insurance process;

25       b.   Assisting WFB in procuring backdated force-placed flood insurance coverage;

26       c.   Accepting kickbacks or so-called "commissions" in connection with force-placed

27            flood insurance; and

28       d.   Passing back a portion these kickbacks or so-called "commissions" to WFB.

-22-

94.     These business practices are inconsistent with and contrary to the statutory, regulatory, and judicial authority cited herein, as well as other legal authority.

95.     WFB systematically engaged in these unfair business practices to the detriment of Plaintiffs and other members of the Wells Fargo California Class and Wells Fargo Backdated California Sub-class (collectively, the "Wells Fargo State Classes").

96.     The harm caused by these business practices vastly outweighs any legitimate utility they possible could have.

97.     Plaintiffs and other members of the Wells Fargo State Classes have been injured and have suffered monetary losses as a result of Wells Fargo's violations of the UCL.

98.     Plaintiffs and other members of the Wells Fargo State Classes are entitled to restitution and injunctive relief for Wells Fargo's violations of the UCL.

99.     As a result of Wells Fargo's violations of the UCL, Plaintiffs and the other members of the Wells Fargo State Classes are also entitled to a recovery of attorney's fees and costs to be paid by Wells Fargo, as provided by California Code of Civil Procedure Section 1021.5 and other applicable law.

### FOURTH CLAIM FOR RELIEF

### CALIFORNIA UNFAIR COMPETITION LAW

### California Business & Professional Code § 17200 *et seq.*

### (Asserted against the QBE Defendants on behalf of the QBE California Class)

100.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

101.    The UCL prohibits, among other things, any unfair business act or practice.

102.    QBEC engaged in unfair business practices in violation of the UCL by, among other things:

    a.   Manipulating the force-placed flood insurance process;

    b.   Issuing backdated force-placed flood insurance, and receiving and retaining premiums for such backdated insurance; and

      c.  Offering Wells Fargo and other mortgage lenders/servicers and/or their affiliates kickbacks or so-called "commissions" in connection with force-placed flood insurance issued by QBEC, in order to gain their business and secure premium payments that QBEC would not otherwise have received.

103.    QBEF engaged in unfair business practices in violation of the UCL by, among other things:

      a.  Manipulating the force-placed flood insurance process;

      b.  Procuring backdated force-placed flood insurance for WFB and other mortgage lender/servicers, and accepting commissions or premium splits in connection with such backdated coverage; and

      c.  Offering Wells Fargo and other mortgage lenders/servicers and/or their affiliates kickbacks or so-called "commissions" in connection with force-placed flood insurance issued by QBEF's affiliate, QBEC, in order to gain their business and secure payments that the QBE Defendants would not otherwise have received.

104.    These business practices are inconsistent with and contrary to the statutory, regulatory, and judicial authority cited herein, as well as other legal authority.

105.    The QBE Defendants systematically engaged in these unfair business practices to the detriment of Plaintiffs and other QBE California Class members.

106.    The harm caused by these business practices vastly outweighs any legitimate utility they possible could have.

107.    Plaintiffs and other members of the QBE California Class have been injured and have suffered monetary losses as a result of the QBE Defendants' violations of the UCL.

108.    Plaintiffs and other members of the QBE California Class are entitled to restitution and injunctive relief for the QBE Defendants' violations of the UCL.

109.    As a result of the QBE Defendants' violations of the UCL, Plaintiffs and the other members of the QBE California Class are also entitled to a recovery of attorney's fees and costs to be paid by the QBE Defendants, as provided by California Code of Civil Procedure section 1021.5 and other applicable law.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## FIFTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT/RESTITUTION

**(Asserted against WFI on behalf of the WFI Unjust Enrichment Class and the WFI Unjustly Backdated Sub-Class)**

110.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

111.    WFI received kickbacks or so-called "commissions" on force-placed flood insurance issued to Plaintiffs and other members of the WFI Unjust Enrichment Class and WFI Unjustly Backdated Sub-Class (the "WFI Classes").

112.    These kickbacks or so-called "commissions" were not legitimately earned.

113.    These kickbacks or so-called "commissions" came at the ultimate expense of Plaintiffs and other members of the WFI Classes.

114.    Retention of these kickbacks or so-called "commissions" by WFI would be unjust and inequitable because (1) they were not legitimately earned; (2) they distort the force-placed insurance process; (3) they are inconsistent with the NFIA; and (4) they are inconsistent with other applicable authority.

115.    Retention of these kickbacks or so-called commissions would be particularly unjust and inequitable in connection with backdated force-placed flood insurance.  Backdated insurance coverage provides no appreciable value to borrowers where the borrower suffered no loss during the backdated period.

116.    WFI knew that the kickbacks or so-called "commissions" that it received in connection with force-placed flood insurance were unjust and unlawful.

117.    WFI knew that force-placing backdated flood insurance coverage is unjust and unlawful.

118.    WFI is guilty of malice, oppression, and/or fraud through its willful and conscious disregard for the rights of Plaintiffs and other members of the WFI Classes.

119.    WFI's willful and conscious disregard for the rights of Plaintiffs and the other members of the WFI Classes created an unjust hardship for Plaintiffs and other class members.

-25-

120.    As a result of WFI's conduct as described herein, Plaintiffs and the WFI Classes are entitled to restitution and disgorgement of all kickbacks or so-called "commissions" that WFI received in connection with force-placed flood insurance for their property, including but not limited to the commissions that it received on backdated force-placed flood insurance.

121.    In addition, Plaintiffs and the WFI Classes are entitled to exemplary damages in connection with this cause of action.

**SIXTH CLAIM FOR RELIEF**

**UNJUST ENRICHMENT/RESTITUTION**

**(Asserted against the QBE Defendants on behalf of the QBE Nationwide Class)**

122.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

123.    QBEC received premium payments in connection with force-placed flood insurance policies issued to Plaintiffs and other members of the QBE Nationwide Class.

124.    QBEC split these premiums with QBEF.

125.    These premiums came at the expense of Plaintiffs and other members of the QBE Nationwide Class who were responsible for (and did) pay these premiums.

126.    To the extent that the QBE Defendants received payments for backdated coverage periods, it would be unjust and inequitable for the QBE Defendants to retain the payments that they received.  Among other things, retention of such backdated coverage premiums would be unjust because: (1) backdated insurance coverage provides no appreciable value to borrowers; (2) the QBE Defendants did not provide anything of real value in return for the premium payments that they received for already-expired coverage; and (3) the QBE Defendants secured these payments by manipulating the force-placed insurance process and by offering improper kickbacks to Wells Fargo and other mortgage lenders/servicers and their affiliates.

127.    The QBE Defendants knew that force-placing backdated flood insurance coverage is unjust and unlawful.

128.    The QBE Defendants are guilty of malice, oppression, and/or fraud through their willful and conscious disregard for the rights of Plaintiffs and other members of the QBE

-26-

1  Nationwide Class.

2      129.    The QBE Defendants' willful and conscious disregard for the rights of Plaintiffs

3  and the QBE Nationwide Class created an unjust hardship for Plaintiffs and other class members.

4      130.    As a result of the QBE Defendants' conduct as described herein, Plaintiffs and the

5  QBE Nationwide Class are entitled to restitution and disgorgement of all ill-gotten gains that the

6  QBE Defendants received in connection with backdated force-placed flood insurance.

7      131.    In addition, Plaintiffs and the QBE Nationwide Class are entitled to exemplary

8  damages in connection with this cause of action.

9                          **PRAYER FOR RELIEF**

10      132.    WHEREFORE, Plaintiffs, on behalf of themselves and the Putative Classes, pray

11  for relief as follows:

12          a)    Determining that this action may proceed as a class action under Rules

13                23(b)(2) and (3) of the Federal Rules of Civil Procedure;

14          b)    Designating Plaintiffs as class representatives for the Putative Classes;

15          c)    Designating Plaintiffs' counsel as counsel for the Putative Classes;

16          d)    Issuing proper notice to the Putative Classes at Defendants' expense;

17          e)    Declaring that WFB breached its contracts with Plaintiffs and the Fannie

18                Mae Class members;

19          f)    Declaring that WFB breached its duty of good faith and fair dealing to

20                Plaintiffs and the Fannie Mae Class members;

21          g)    Declaring that Defendants' actions as described herein violated the UCL;

22          h)    Declaring that WFI, QBEF, and QBEC were unjustly enriched by the

23                conduct described herein;

24          i)    Declaring that Defendants acted willfully in deliberate or reckless disregard

25                of applicable law and the rights of Plaintiffs and the Putative Classes;

26          j)    Awarding appropriate equitable relief, including but not limited to an

27                injunction requiring WFB to reverse all unlawful, unfair, or otherwise

28                improper charges for flood insurance coverage, prohibiting WFB, WFI,

1   and their affiliates from receiving so-called "commissions" or other

2   compensation in connection with force-placed flood insurance coverage,

3   prohibiting the QBE Defendants from offering or providing so-called

4   "commissions" or other compensation to mortgage lenders/servicers or

5   their affiliates (including Wells Fargo) in connection with force-placed

6   flood insurance, prohibiting WFB from charging borrowers for backdated

7   flood insurance coverage, prohibiting the QBE Defendants from issuing or

8   procuring backdated flood insurance coverage; and ordering Defendants to

9   cease and desist from engaging in further unlawful conduct in the future;

10   k)   Awarding restitution as provided by the UCL and common law;

11   l)   Awarding actual damages and interest;

12   m)   Awarding punitive or exemplary damages in connection with Plaintiffs'

13   unjust enrichment claim;

14   n)   Awarding reasonable attorneys' fees and costs and expenses to the extent

15   permitted by law; and

16   o)   Granting other and further relief, in law or equity, as this Court may deem

17   appropriate and just.

18   **<u>DEMAND FOR JURY TRIAL</u>**

19   133.   Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the

20   Putative Classes demand a trial by jury.

21

22   Dated: February 19, 2013            NICHOLS KASTER, LLP

23                                        By:   _____

24                                              Matthew C. Helland

25                                        NICHOLS KASTER, PLLP

26                                        Attorneys for Plaintiff and the Putative Classes

27

28

# Exhibit 1

RECORDING REQUESTED BY:
Stewart Title - PB

WHEN RECORDED MAIL TO:

Wachovia Mortgage, FSB
1100 Corporate Center Drive
Raleigh, NC 27607

**2008-135472**
STEWART TITLE OF CALIFORNIA
08:00am 12/18/08 DT  Fee: 66.00
Count of pages 20
Recorded in Official Records
County of San Mateo
Warren Slocum
Assessor-County Clerk-Recorder

*20080135472AR*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

**TITLE(S)**

Deed of Trust

Title Order No.: 1362-126856          Escrow No.: 2913-126856          APN: 035-523-290

Recording Requested By:
Stewart Title of California, Inc.
289 S. San Antonio Rd, Ste 100, LOS ALTOS, CA 94022
Return To:
Wachovia Mortgage, FSB
1100 Corporate Center Drive
Raleigh, NC 27607

Prepared By:
Wachovia Mortgage, FSB
1100 Corporate Center Drive
Raleigh, NC 27607

———————————————[Space Above This Line For Recording Data]———————————————

# DEED OF TRUST

MIN 100648714000104820

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated December 12, 2008 ,
together with all Riders to this document.

(B) "Borrower" is  Valerie Leghorn and Arley Leghorn, Wife and Husband

Borrower's address is    Redacted, San Mateo, CA Redacted
. Borrower is the trustor under this Security Instrument.

(C) "Lender" is Wachovia Mortgage, FSB

Lender is a Federal Savings Bank
organized and existing under the laws of United States of America

241438                                               001400010482 Leghorn

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005 1/01

Wolters Kluwer Financial Services
VMP®-6A(CA) (0711)
Page 1 of 15                    Initials

Lender's address is 1100 Corporate Center Drive, Raleigh, NC 27607

(D) "Trustee" is TRSTE, INC., a Virginia Corporation
201 South Jefferson Street, Roanoke, VA 24011
(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the beneficiary under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
(F) "Note" means the promissory note signed by Borrower and dated December 12, 2008
The Note states that Borrower owes Lender Four Hundred Seventeen Thousand

Dollars

(U.S. $417,000.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than January 1, 2039
(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."
(H) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
(I) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☒ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | ☐ Other(s) [specify] |

(J) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
(K) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
(L) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
(M) "Escrow Items" means those items that are described in Section 3.
(N) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
(O) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on, the Loan.
(P) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

241438                                                                                 001400010482 Leghorn
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005   1/01
VMP®-6A(CA) (0711)                              Page 2 of 16              Initials

**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County        of San Mateo        :

     [Type of Recording Jurisdiction]           [Name of Recording Jurisdiction]

The Assessor's Parcel Number (Property Tax ID#) for the Real Property is 035-523-290. SEE EXHIBIT "A"

Parcel ID Number: 035-523-290            which currently has the address of

Redacted                                                   [Street]

San Mateo                       [City], California   Redacted      [Zip Code]

("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and cancelling this Security Instrument.

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances

241438                                               001400010482 Leghorn

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS      Form 3005   1/01

VMP®-6A(CA) (0711)                     Page 3 of 15        Initials:

of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be

in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly  payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the

lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with

241438                                                          001400010482 Leghorn

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005   1/01
VMP ®-6A(CA) (0711)                              Page 8 of 16          Initials

the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable

241438

001400010482 Leghorn

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01
VMP ®-6A(CA) (0711)                                          Page 7 of 16          Initials

attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(Page 10 of 20)

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender

241438                                                            001400010482 Leghorn
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01
VMP ®-6A(CA) (0711)                          Page 9 of 16          Initials

to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

241438                                                                                    001400010482 Leghorn
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS        Form 3005  1/01
VMP®-6A(CA) (0711)                              Page 10 of 16            Initials

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA

241438

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS

VMP®-6A(CA) (0711)                                    Page 11 of 15

001400010482 Leghorn

Form 3005  1/01

requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

241438

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
VMP ®-6A(CA) (0711)                                    Page 12 of 15                    Initials:

001400010482 Leghorn
Form 3005   1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee. Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. Statement of Obligation Fee. Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

241438                                                                001400010482 Leghorn

CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3005  1/01
VMP®-6A(CA) (0711)                          Page 13 of 15          Initials

The undersigned Borrower requests that a copy of any Notice of Default and any Notice of Sale under this Security Instrument be mailed to the Borrower at the address set forth above. A copy of any Notice of Default and any Notice of Sale will be sent only to the address contained in this recorded request. If the Borrower's address changes, a new request must be recorded.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____     _____ (Seal)
                                     Valerie Leghorn           -Borrower

_____     _____ (Seal)
                                     Arley Leghorn             -Borrower

_____ (Seal)     _____ (Seal)
                -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                -Borrower                                      -Borrower

_____ (Seal)     _____ (Seal)
                -Borrower                                      -Borrower

State of California
County of Santa Clara                                    } ss.

On 12/15/08                    before me,   DL Borchert, notary public
                                                        , personally appeared

Valerie Leghorn and Arley Leghorn

                                                                    , who
proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the instrument. I certify under PENALTY OF
PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

                                          Borchert                    _____(Seal)

D. L. BORCHERT
COMM. #1686778
NOTARY PUBLIC · CALIFORNIA
SANTA CLARA COUNTY
COMM. EXPIRES AUG. 3, 2010

241438                                              001400010482 Leghorn
CALIFORNIA-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS    Form 3005  1/01
VMP®-6A(CA) (0711)                          Page 16 of 16         Initials

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 12th                    day of December, 2008                                    , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to Wachovia Mortgage, FSB

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at: Redacted                 , San Mateo, CA Redacted

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in

(the "Declaration"). The Property is a part of a planned unit development known as Mariners Island

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

**PUD COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A. PUD Obligations.** Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

240630                                                      001400010482 Leghorn

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
Form 3150 1/01
Wolters Kluwer Financial Services          Page 1 of 3                Initials:
VMP®-7R (0411).01

**B. Property Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of property insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

240630

801400010482 Leghorn

Initials:

VMP®-7R (0411).01          Page 2 of 3          Form 3150 1/01

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_____ (Seal)
Valerie Leghorn        -Borrower

_____ (Seal)
Arley Leghorn         -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

_____ (Seal)
                      -Borrower

240630                              001400010482 Leghorn

VMP®-7R (0411).01          Page 3 of 3          Form 3150 1/01

# EXHIBIT "A"

## LEGAL DESCRIPTION

ORDER NO.:     126856
ESCROW NO.:

The land referred to herein is situated in the State of California County of San Mateo, City of San Mateo, and described as follows:

PARCEL ONE:

Lot 36, Block 2, as designated on the Map entitled "Map of Mariner's Island Unit No. 3", which Map was filed in the office of the Recorder of the County of San Mateo, State of California on February 28, 1968, in Book 67 of Maps at Page 19.

PARCEL TWO:

Exclusive easement for the purpose of a pedestrian walkway to and from the residence now located or to be located on the dominant estate abetting and being contiguous to said easement and Marina Lagoon also known as Seal Slough together with the right to construct, maintain and repair a necessary ramp or stairway, if required, and connected to said residence and leading therefrom to said Marina Lagoon and to which a floating boat dock may be attached and also together with the right to construct, maintain and repair a porch connected to said residence over portions of parcel "A" , areas 1,2,4,5,6,7,9,11 and 12, Block 2 Maps of Mariner's Island Unit No. 3, filed in the office of the County Recorder of San Mateo County, State of California, on February 28, 1968 in Book 67 of Maps at Page19, appurtenant to meshed Lots in Block 2 above described.

PARCEL THREE:

An undivided 1/161 interest in the following:

PARCEL 'A', Areas 1 through 12, inclusive, Block 2 and Parcel "A", Area 1, Block 3, Map of Mariner's Island Unit No. 3 filed in the office of the County Recorder of San Mateo County, State of California on February 28, 1968 in Book 67 of Maps at Page 19.

APN NO. 035-523-290                    JPN: 035-052-521-29A

Exhibit 2

Wells Fargo Home Mortgage #708
P.O. Box 23030, Jacksonville, FL 32241-3030
800-552-2961



0017747 01 MB 0.401  **AUTO   T0 0 0280 84404-151553 C1-1
VALERIE LEGHORN
ARLEY LEGHORN
Redacted
SAN MATEO CA Redacted

Notice date: 01/30/12
Loan number: Redacted

||**||||**|*|**||*||**||**||**||||||**|*||*|*|**|**||*||**|||**||**

## Action required - important notice of temporary flood insurance

| Insurance expiration date: | Property address: |
|---|---|
| 12/12/09 | Redacted<br>SAN MATEO CA Redacted |

The National Flood Insurance Reform Act of 1994 requires Wells Fargo Home Mortgage and all other federally regulated lenders that service home loans to inform customers about their obligation to purchase flood insurance. Because your property lies in a "Special Flood Hazard Area" on flood maps produced by the Federal Emergency Management Agency ("FEMA"), we require that flood insurance must be maintained on all structures on the property for the entire term of the loan.

Previously we notified you that we did not have evidence of your flood insurance policy to protect your structure/improvements per the terms of your Mortgage (or Deed of Trust) and we requested that you provide current evidence of insurance to us. **At a minimum, we require that you maintain flood insurance that is equal to 100% of the estimated replacement cost to rebuild your home and other improvements on your property (as determined by you and your insurance agent). The maximum amount of flood insurance you are required to maintain on any one residential building is $250,000. Normally we would expect the amount of insurance for your structures/improvements on your flood policy to be equal to the amount of insurance for those same structures/improvements on your hazard insurance policy.** It appears that you do not have insurance as of the expiration date shown above. Your mortgage documents permit us to purchase insurance at your expense should you fail to do so.

Continued on Back

20120130-00015072

0001-0017747 0027554

We have secured temporary insurance coverage effective from the insurance expiration date as shown above, through QBE Insurance Corporation. This binder will provide insurance coverage against loss to your structure/improvements until you provide proof of acceptable insurance coverage or, if we do not receive proof that you have insurance, until we purchase an annual flood insurance policy that will be effective as of the expiration date shown above. This binder covers your structure/improvements for direct loss or damage subject to the terms of the policy. It does not provide any coverage for personal property, nor does it protect you from liability against accidents that occur on your property.

## For your information

In the mortgage documents you signed, you agreed to keep insurance on your structure/improvements at all times, in the form and the amounts we require. Failure to do so is a breach of those requirements. Please contact your insurance agent or company and purchase flood insurance coverage.

If the property that secures this loan is part of a condominium, your association may have flood insurance that will satisfy this requirement. Please ask your association to provide a copy of their flood insurance coverage to us.

## To satisfy this requirement:

- Request proof of flood coverage and send it to us at the address shown below, or
- Fax it to 1–904–732–7786, or
- Provide this information to us by visiting our website, www.updatemyinsurance.com/Wells.

Please be sure your policy includes your loan number and a Mortgagee Clause or Lenders Loss Payable Endorsement made out to:

WELLS FARGO BANK NA #708
ITS SUCCESSORS AND/OR ASSIGNS
PO BOX 23030
JACKSONVILLE FL 32241–3030
Loan number: 1400010482–708

Upon receipt of your policy, this binder will be cancelled. There is no charge to you if there has been no lapse in your coverage. You will be charged for any gap between the expiration date of your last policy and the effective date of your new policy.



Please call us as soon as possible.
Let us help you today.

## We can help

If your flood insurance is not included within your monthly mortgage payment and you are currently unable to pay your flood insurance premium, please call us as soon as possible and ask us to set up an escrow account and advance the insurance premium for you. If you choose this option, you would repay us for the advance in your future monthly payments. We will need the contact information for your insurance agent or company as well as the amount of the premium currently due. Insurance companies allow a very short time to reinstate policies that have expired and it is important that you call us immediately if you need our assistance. We cannot pay the insurance premium for flood coverage you obtain without your cooperation.



You should be able to obtain flood insurance coverage from most local insurance agents. If you are unable to obtain flood insurance coverage from your agent or company, please call us and ask that we connect you with Wells Fargo Insurance, Inc., a licensed insurance agency that represents insurance companies who provide flood insurance through the National Flood Insurance Program.

## Failure to provide proof of insurance

If we do not receive proof of coverage, we will purchase a one year policy. The premium for this policy is shown on the attached binder. This premium will be charged to your escrow account at the end of the binder period. If you do not have an escrow account, one will be established for you. Your monthly mortgage payment will be increased to include the cost of this policy. You may cancel this policy at any time by giving us proof of other acceptable coverage. When you provide proof of acceptable coverage, the policy we have obtained will be cancelled and you will be charged only for the days this policy was in force. Any unused premium will be refunded to your escrow account.

## Your rights

If you disagree with the flood zone that we have determined for your property you have the right to challenge our determination under Section 524 of the National Flood Insurance Reform Act of 1994. You will need to provide written evidence from a community official, registered engineer, architect or surveyor, including an Elevation Certificate, stating the reason for your challenge. If you have documentation we will assist you in applying to FEMA for a Letter of Map Amendment. If you elect to challenge our determination you must maintain flood insurance on the property until FEMA approves the request for the Letter of Map Amendment.

You have the right to independently purchase flood insurance from the insurance agent or company of your choice and we urge you to do so. In nearly all instances, the flood insurance coverage we obtain will be far more expensive than a policy you could obtain from an agent or insurance company of your choice. The policy we obtain will only provide coverage for direct physical damage to the structure/improvements, and will not cover any personal property or liability. Wells Fargo Bank, N.A. may be the named insured. The amount of coverage we obtain may not be adequate to protect your interest.

The policy we obtain will supersede any lender coverage remaining in effect under any previous policy.

## Amount of insurance we will obtain

The amount of coverage shown on the binder is based on the amount of coverage we require as described above. If you have information to verify that the amount should be different, please notify us. This request must be in writing and should be sent to the above address. Please include your loan number on the letter.

If we purchase the insurance for you, it will be obtained with the assistance of Wells Fargo Insurance, Inc., a licensed insurance agency and affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance will receive a commission on the insurance we obtain. QBE Insurance Corporation is subject to the applicable insurance laws and regulations in your state. No Wells Fargo entity has any other affiliation with the insurance carriers we use in this process. If you have any questions about the administration of this program by Wells Fargo Home Mortgage, Wells Fargo Insurance, Inc. or the insurance obtained through the third party insurance carrier, please contact us at the phone number below.

Continued on Back

We strongly recommend that you obtain your own insurance coverage.

Your flood insurance agent should be able to answer any questions you may have about flood insurance, or you may visit the National Flood Insurance Program website at www.floodsmart.gov.

If you have any questions or believe that there is an error in our records, please call us at 1-800-552-2961, Monday through Friday from 7 am to 7 pm, central time and one of our customer service professionals will be happy to help you. Thank you for your assistance.

Fair Debt Collection Practices Act Disclosure

Wells Fargo Home Mortgage is required by the Fair Debt Collection Practices Act to inform you that, as your loan servicer, we are attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, Wells Fargo Home Mortgage will only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally.

With respect to those loans located in the State of California, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 am or after 9 pm. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.



Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.
© 2011 Wells Fargo Bank, N.A. All rights reserved. Member FDIC


Lender

**QBE Insurance Corporation**
**88 Pine Street, 16th Floor**
**New York, NY 10005**
**Home Office:  c/o CT Corporation System**
**116 Pine Street, Suite 320**
**Harrisburg, PA 17101**

**Toll Free Customer Service: 1-800-552-2961**
PO BOX 23030, JACKSONVILLE FL 32241-3030

## 90-DAY BINDER

LOAN NUMBER:  Redacted

NOTIFICATION DATE:  01/30/12

**ADDITIONAL NAMED INSURED**
VALERIE LEGHORN
ARLEY LEGHORN
Redacted
SAN MATEO CA Redacted

**NAMED INSURED MORTGAGEE**
WELLS FARGO BANK NA #708
ITS SUCCESSORS AND/OR ASSIGNS
PO BOX 23030
JACKSONVILLE FL 32241-3030

| | | Amount of Insurance | Premium |
|---|---|---|---|
| BINDER NUMBER  BFL000474717 | Dwelling | $      250,000 | $      2,250.00 |
| POLICY TERM: | | | |
| FROM  12/12/09          TO  12/12/10 | Flood Deductible - per loss occurrence | | $          750 |
| ☐ NOON          ☒ 12:01am | Located in CBRA or Non-Participating Community | | $          750 |
| BINDER IS EFFECTIVE FOR 90 DAYS FROM THE EFFECTIVE DATE SHOWN ABOVE | | | |
| PROPERTY LOCATION  Redacted  SAN MATEO CA Redacted | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | | | $ |
| | TOTAL CHARGES | | $      2,250.00 |

We have not received a new/renewal insurance policy covering your mortgaged property. We do not believe this was your intention, but a lapse in coverage has occurred.

We have secured temporary coverage in the form of a 90-day binder through the Company shown above, and you will be charged for the policy premium. This binder covers the described property for risks of direct loss subject to the terms, conditions and limitations of the policy in current use by the company. If evidence of acceptable coverage is received during this binder period, you will be charged only for any lapse in coverage.

**The policy only covers dwellings. It does not cover your personal property.**

Please remember, it is your responsibility to maintain property insurance coverage on your property. If evidence of acceptable coverage is not received, a policy will be obtained through the Company shown above.

This coverage will be cancelled back to the original effective date, with no premium charge applying, if you provide coverage effective on or before the effective date of this binder.

**For Customer Service questions, please call our toll free Customer Service Number at: 1-800-552-2961**

**To report a CLAIM, please contact our Claim Department at: 1-800-824-8562**
**or, you may report a new claim using our website at www.qbefirst.com**

RF1301 0109

Page 1 of 1

0003-0017747 0027556

Exhibit 3

Wells Fargo Home Mortgage #708
P.O. Box 23030, Jacksonville, FL 32241-3030
800-552-2961



VALERIE LEGHORN
ARLEY LEGHORN
Redacted
SAN MATEO CA Redacted

Notice date: 03/06/12
Loan number: Redacted

## Action required - flood insurance policy enclosed

| Insurance effective date: | Property address: |
|---|---|
| 12/12/09 | Redacted<br>SAN MATEO CA Redacted |

The National Flood Insurance Reform Act of 1994 requires Wells Fargo Home Mortgage and all other federally regulated lenders that service home loans to inform customers about their obligation to purchase flood insurance. Because your property lies in a "Special Flood Hazard Area" on flood maps produced by the Federal Emergency Management Agency ("FEMA"), we require that flood insurance must be maintained on all structures on the property for the entire term of the loan.

Enclosed is a flood insurance policy we have obtained in accordance with the terms of your Mortgage (or Deed of Trust). **We have purchased this policy on your behalf because we did not receive proof of acceptable continuous insurance from you as previously requested in the recent notices we sent to you. Your structure/improvements are now insured by QBE Insurance Corporation.** This policy covers your structure/improvements for direct loss or damage by flood subject to the terms of the policy. It does not provide any coverage for personal property, nor does it protect you from liability against accidents that occur on your property. The annual premium is shown on the policy and will be charged to your escrow account. If you do not have an escrow account, one is being established for you. Your monthly mortgage payment will be increased to include the cost of this policy.

Continued on Back

## For your information

In the mortgage documents you signed, you agreed to keep insurance on your structure/improvements at all times, in the form and amounts we require. Failure to do so is a breach of those requirements. **At a minimum, we require that you maintain flood insurance that is equal to 100% of the estimated replacement cost to rebuild your home and other improvements on your property (as determined by you and your insurance agent). The maximum amount of flood insurance you are required to maintain on any one residential building is $250,000. Normally we would expect the amount of insurance for your structures/improvements on your flood policy to be equal to the amount of insurance for those same structures/improvements on your hazard insurance policy.**

If the property that secures this loan is part of a condominium, your association may have flood insurance that will satisfy this requirement. Please ask your association to provide a copy of their flood insurance coverage to us.

You may cancel the insurance we obtained at any time by giving us proof of other acceptable coverage. When you provide proof of acceptable coverage, the policy we have obtained will be cancelled and you will be charged only for the days this policy was in force. Any unused premium will be refunded to your escrow account.

## Your rights

If you disagree with the flood zone that we have determined for your property you have the right to challenge our determination under Section 524 of the National Flood Insurance Reform Act of 1994. You will need to provide written evidence from a community official, registered engineer, architect or surveyor, including an Elevation Certificate, stating the reason for your challenge. If you have documentation we will assist you in applying to FEMA for a Letter of Map Amendment. If you elect to challenge our determination you must maintain flood insurance on the property until FEMA approves the request for the Letter of Map Amendment.

You have the right to independently purchase flood insurance from the insurance agent or company of your choice and we urge you to do so. In nearly all instances, the flood insurance coverage we obtained will be far more expensive than a policy you could obtain from an agent or insurance company of your choice. The policy we obtained will only provide coverage for direct physical damage to the structure/improvements, and will not cover any personal property or liability. Wells Fargo Bank, N.A. may be the named insured. The amount of coverage we obtained may not be adequate to protect your interest.

The policy we obtained supersedes any lender coverage remaining in effect under any previous policy.

 Please call us as soon as possible.
Let us help you today.

## We can help

**If you have not purchased your own flood insurance because you currently cannot afford to pay the annual premium, please call us as soon as possible and request that we pay the premium due to the insurance provider you select.** If you choose this option, you would repay us for the advance in your future monthly payments. We will need the contact information for your insurance agent or company as well as the amount of the premium due. We cannot pay the insurance premium for flood coverage you obtain without your cooperation.

You should be able to obtain flood insurance coverage from most local insurance agents. If you are unable to obtain flood insurance coverage from your agent or company, please call us and ask that we connect you with Wells Fargo Insurance, Inc., a licensed insurance agency that represents insurance companies who provide flood insurance through the National Flood Insurance Program.

If you have obtained your own flood insurance, you must:

- Request proof of flood coverage and send it to us at the address shown below, or
- Fax it to 1–904–732–7786, or
- Provide this information to us by visiting our website, www.updatemyinsurance.com/Wells.

Please be sure your policy includes your loan number and a Mortgagee Clause or Lenders Loss Payable Endorsement made out to:

> WELLS FARGO BANK NA #708
> ITS SUCCESSORS AND/OR ASSIGNS
> PO BOX 23030
> JACKSONVILLE FL 32241–3030
> Loan number: 1400010482–708

## When you provide proof of insurance

Upon receipt of your policy, the insurance we purchased on your behalf will be cancelled. There is no charge to you if there has been no lapse in coverage. You will be charged for any gap between the expiration date of your last policy and the effective date of your new policy. Any unused premium will be refunded to your escrow account.

## Amount of insurance we have obtained

The amount of coverage shown on the enclosed policy is based on the amount of coverage we require as described above. If you have information to verify that the amount should be different, please notify us. This request must be in writing and should be sent to the above address. Please include your loan number on the letter.

The insurance we have purchased was obtained with the assistance of Wells Fargo Insurance, Inc., a licensed insurance agency and affiliate of Wells Fargo Bank, N.A. Wells Fargo Insurance will receive a commission on the insurance we obtained. QBE Insurance Corporation is subject to the applicable insurance laws and regulations in your state. No Wells Fargo entity has any other affiliation with the insurance carriers we use in this process. If you have any questions about the administration of this program by Wells Fargo Home Mortgage, Wells Fargo Insurance, Inc. or the insurance obtained through the third party insurance carrier, please contact us at the phone number below.

## We strongly recommend that you obtain your own insurance coverage.

Your flood insurance agent should be able to answer any questions you may have about flood insurance, or you may visit the National Flood Insurance Program website at www.floodsmart.gov.

If you have any questions or believe that there is an error in our records, please call us at 1–800–552–2961, Monday through Friday from 7 am to 7 pm, central time and one of our customer service professionals will be happy to help you. Thank you for your assistance.

Continued on Back

Fair Debt Collection Practices Act Disclosure

Wells Fargo Home Mortgage is required by the Fair Debt Collection Practices Act to inform you that, as your loan servicer, we are attempting to collect a debt, and any information obtained will be used for that purpose. However, if you have received a discharge from bankruptcy, and the loan was not reaffirmed in the bankruptcy case, Wells Fargo Home Mortgage will only exercise its rights against the property and is not attempting any act to collect the discharged debt from you personally.

With respect to those loans located in the State of California, the state Rosenthal Fair Debt Collection Practices Act and the federal Fair Debt Collection Practices Act require that, except under unusual circumstances, collectors may not contact you before 8 am or after 9 pm. They may not harass you by using threats of violence or arrest or by using obscene language. Collectors may not use false or misleading statements or call you at work if they know or have reason to know that you may not receive personal calls at work. For the most part, collectors may not tell another person, other than your attorney or spouse, about your debt. Collectors may contact another person to confirm your location or enforce a judgment. For more information about debt collection activities, you may contact the Federal Trade Commission at 1-877-FTC-HELP or www.ftc.gov.

Wells Fargo Home Mortgage is a division of Wells Fargo Bank, N.A.
© 2011 Wells Fargo Bank, N.A. All rights reserved. Member FDIC


Equal Housing
Lender

QBE Insurance Corporation
88 Pine Street, 16th Floor
New York, NY 10005
Home Office: c/o CT Corporation System
116 Pine Street, Suite 320
Harrisburg, PA 17101

Toll Free Customer Service: 1-800-552-2961
PO BOX 23030, JACKSONVILLE FL 32241-3030

## Additional Named Insured Certificate - Flood

LOAN NUMBER: Redacted

NOTIFICATION DATE: 03/06/12

**ADDITIONAL NAMED INSURED**
VALERIE LEGHORN
ARLEY LEGHORN
Redacted
SAN MATEO CA Redacted

**NAMED INSURED MORTGAGEE**
WELLS FARGO BANK NA #708
ITS SUCCESSORS AND/OR ASSIGNS
PO BOX 23030
JACKSONVILLE FL 32241-3030

| | | | Amount of Insurance | | Premium | |
|---|---|---|---|---|---|---|
| POLICY NUMBER FLR750050153 | Dwelling | | $ | 250,000 | $ | 2,250.00 |
| POLICY TERM: | | | | | | |
| FROM 12/12/09     TO 12/12/10 | Flood Deductible - per loss occurrence | | | | $ | 750 |
| ☐NOON     ☒12:01am | Located in CBRA or Non-Participating Community | | | | $ | 750 |
| IF WE ELECT TO CONTINUE THIS INSURANCE, WE WILL RENEW THIS POLICY IF YOU PAY THE REQUIRED RENEWAL PREMIUM FOR EACH SUCCESSIVE POLICY PERIOD, SUBJECT TO OUR RATES, RULES AND FORMS IN EFFECT. YOU MUST PAY US PRIOR TO THE END OF THE CURRENT POLICY PERIOD OR ELSE THIS POLICY WILL EXPIRE. | | | | | | |
| PROPERTY LOCATION | | | | | $ | |
| Redacted SAN MATEO CA Redacted | | | | | $ | |
| | | | | | $ | |
| ENDORSEMENTS ATTACHED AND FORMING A PART OF THE POLICY RF1120 (0109),RF1200 (0109),RF1201 (0109),IL1701 (0109), RF1504 (0109),RF1401 (0109),RF1402 (0109),RF1403 (0109), QBGS01 (0109),IL1704 (0109) | | | | | $ | |
| | | | | | $ | |
| | | | | | $ | |
| | | | | | $ | |
| | | | TOTAL CHARGES | | $ | 2,250.00 |

**DEDUCTIBLES:** Please refer to the deductibles shown above for the coverage provided by this policy.

### THIS POLICY ONLY COVERS DWELLINGS, IT DOES NOT COVER YOUR PERSONAL PROPERTY.

"The limit of liability for this structure (Coverage A) is based on an estimate of the cost to rebuild your building, including an approximate cost for labor and materials in your area, and specific information that you have provided about your building."

"This certificate or verification of insurance is not an insurance policy and does not amend, extend or alter the coverage afforded by the policies listed herein. Notwithstanding any requirement, term, or condition of any contract or other document with respect to which this certificate of insurance may be issued or may pertain, the insurance afforded by the policies described herein is subject to all the terms, exclusions and conditions of policies."

For Customer Service questions, please call our toll free Customer Service Number at: 1-800-552-2961

To report a CLAIM, please contact our Claim Department at 1-800-824-8562
or, you may report a new claim using our website at www.qbcfirst.com

Subject to the terms and provisions of this policy and the coverage forms and endorsements attached hereto, it is agreed that the insurance applies to the property described above and to any person shown as an Additional Named Insured with respect to such property, subject to the following additional provisions:

(a) The Named Insured Mortgagee is authorized to act for the Additional Named Insured(s) in all matters pertaining to this insurance including receipt of Notice of Cancellation; and return premium, if any.

(b) The Named Insured Mortgagee is authorized to advance all funds to be recovered from the Additional Named Insured(s) for the insurance afforded.

(c) Loss, if any, shall be adjusted with and payable to the Named Insured Mortgagee and the Additional Named Insured(s), as their interests may appear, either by a single instrument so worded or by separate instruments payable respectively to the Named Insured Mortgagee and the Additional Named Insured, at the company's option.

Exhibit 4

Wells Fargo Home Mortgage #708
P.O. Box 23030, Jacksonville, FL 32241-3030
800-552-2961



0004886 01 MB 0.401  **AUT0   T6 0 0287 94404-151553 C1 1
VALERIE LEGHORN
ARLEY LEGHORN
Redacted
SAN MATEO CA Redacted

Notice date: 03/07/12
Loan number: Redacted

|||||⁖||||||||||||⁖||||⁖||||⁖||||⁖||||||||⁖||||||||||⁖||||||⁖||⁖||⁖⁖⁖⁖

## Action required - important notice regarding your flood insurance

| Insurance expiration date: | Property address: |
|---|---|
| 12/12/10 | Redacted<br>SAN MATEO CA Redacted |

The National Flood Insurance Reform Act of 1994 requires Wells Fargo Home Mortgage and all other federally regulated lenders that service home loans to inform customers about their obligation to purchase flood insurance. Because your property lies in a "Special Flood Hazard Area" on flood maps produced by the Federal Emergency Management Agency ("FEMA"), we require that flood insurance must be maintained on all structures on the property for the entire term of the loan.

It has recently come to our attention that we have not received a copy of your flood insurance policy that shows coverage in force as of the insurance expiration date shown above.

As your mortgage servicer, we monitor your loan for continuous flood insurance coverage. At a minimum, we require that you maintain flood insurance that is equal to 100% of the estimated replacement replacement cost to rebuild your home and other improvements on your property (as determined by you and your insurance agent). The maximum amount of flood insurance you are required to maintain on any one residential building is $250,000. Normally we would expect the amount of insurance for your structures/improvements on your flood policy to be equal to the amount of insurance for those same structures/improvements on your hazard insurance policy.

Continued on Back