1

2

3                  IN THE UNITED STATES DISTRICT COURT

4              FOR THE NORTHERN DISTRICT OF CALIFORNIA

5

6

7

8    ARLEY LEGHORN, et al.,                    Case No.: C-13-00708 JCS

9              Plaintiffs,                      **ORDER DENYING DEFENDANTS'
                                                MOTIONS TO DISMISS AND TO
10        v.                                    STRIKE**

11

12   WELLS FARGO BANK, N.A., et al.,

13            Defendants.

14   **I.      INTRODUCTION**

15           This is a putative class action brought by Plaintiffs Arley and Valerie Leghorn ("Plaintiffs")

16   against Wells Fargo Bank, N.A. ("WFB"), Wells Fargo Insurance, Inc. ("WFI") (WFB and WFI are

17   referred to collectively as "Wells Fargo"), QBE Insurance Corporation ("QBEC"), and QBE First

18   Insurance Agency, Inc. ("QBEF") (QBEC and QBEF are referred to collectively as "QBE")

19   (collectively, "Defendants") for breach of contract, breach of the covenant of good faith and fair

20   dealing, violation of California's Unfair Competition Law ("UCL"), and unjust enrichment/restitution.

21   Two Motions are presently before the Court:  (1) Wells Fargo's Motion to Dismiss Class Action

22   Complaint and to Strike ("Wells Fargo Motion"); and (2) QBE's Motion to Dismiss the Complaint

23   ("QBE Motion").  A hearing on the Motions was held on June 14, 2013 at 9:30 a.m.  For the reasons

24   stated below, the Court DENIES Defendants' Motions.[1]

25   //

26   //

27   //

28   _____
     [1] The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  *See*
     Dkt. No. 39.

## II.    BACKGROUND

### A.    The Complaint

In their Complaint, Plaintiffs allege as follows.  Mortgage lenders and servicers generally have the right to force-place flood insurance where the property securing the loan falls in a Special Flood Hazard Area ("SFHA").  Complaint, ¶ 2.  WFB systematically abused their rights by (1) purchasing backdated policies; (2) charging borrowers for expired or partially expired coverage; and (3) arranging for kickbacks or "commissions" for itself and/or its affiliates in connection with force-placed flood insurance.  *Id.*  WFI actively participated in this scheme by (1) procuring backdated force-placed flood insurance for WFB; and (2) accepting kickbacks or commissions from QBE and other entities for such backdated coverage.  *Id.* at ¶ 3.  QBEC also participated in the scheme by issuing backdated force-placed flood insurance for WFB.  *Id.* at ¶ 4.  QBEC shared a portion of the premiums with QBEF, which attracted Wells Fargo's business by offering kickbacks or commissions to Wells Fargo.  *Id.*

In December, 2008, Plaintiffs obtained a mortgage loan from Wachovia Mortgage, FSB ("Wachovia") in the amount of $417,000 secured by a deed of trust on their homestead in San Mateo, California.  *Id.* at ¶ 17 and Ex. 1.  WFB acquired Wachovia later that month and is the current lender-in-interest to Plaintiffs' mortgage.  *Id.* at ¶ 18.  Plaintiffs' mortgage loan is serviced through Wells Fargo Home Mortgage, a division of WFB.  *Id.*

Under the National Flood Insurance Act ("NFIA") lenders are required to ensure that any improved property in a SFHA that secures a loan or line of credit is covered by flood insurance in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the NFIA ($250,000), whichever is less.  *Id.* at ¶ 19 (citing 42 U.S.C. § 4012a(b)(1)).  If the required amount of insurance is not maintained, the NFIA authorizes mortgage lenders and servicers to purchase flood insurance for the borrower in the required amount.  *Id.* at ¶ 20 (citing 42 U.S.C. § 4012a(e)(1)-(2)).  The NFIA does not authorize lenders and servicers to purchase backdated insurance coverage or to enrich themselves by accepting kickbacks and commissions in connection with force-placed insurance policies.  *Id.*

United States District Court
Northern District of California

2

Plaintiffs' deed of trust also allows the lender to force-place flood insurance if Plaintiffs fail to maintain the amount of coverage required by the lender. *Id*. at ¶ 21 and Ex. 1 at ¶ 5. The deed of trust does not provide authority to purchase backdated insurance coverage or allow the lender to arrange for kickbacks, commissions, or other compensation for itself or its affiliates in connection with the force-placement of insurance coverage. *Id*. (citing Ex. 1 ¶¶ 9, 14, 16).

Plaintiffs' property was located in a SFHA from the date they originated their loan until October 16, 2012, when the Federal Emergency Management Agency implemented a map revision for the San Mateo area. *Id*. at ¶ 22. Plaintiffs continuously maintained $250,000 worth of flood insurance coverage on their property from the origination of their mortgage loan through October 16, 2012. *Id*. at ¶ 23. This met the requirements of NFIA and WFB. *Id*. WFB had notice of Plaintiffs' flood insurance coverage. *Id*. at ¶ 24. Even so, on January 30, 2012, WFB sent Plaintiffs a form letter claiming that they did not have proper insurance in the period beginning on December 12, 2009 and advising Plaintiffs' that it had procured a flood insurance binder from QBEC covering a 90-day period beginning on that date. *Id*. at ¶ 24 and Ex. 2. On March 6, 2012, WFB sent Plaintiffs a letter indicating that it had purchased a one-year flood insurance policy from QBEC for the period from December 12, 2009 to December 12, 2010. *Id*. at ¶ 25 and Ex. 3. The premium for the policy was $2,250. *Id*. at ¶ 26. The insurance was obtained with the assistance of WFI, an affiliate of WFB, which received a commission. *Id*. at ¶ 26 and Ex. 3. Both policies were worthless because Plaintiffs suffered no flood losses and had no flood-related claims during that time period. *Id*. at ¶¶ 24-25.

On March 7, 2012, WFB sent Plaintiffs a letter informing them that their flood insurance coverage had expired on December 12, 2010. *Id*. at ¶ 27 and Ex. 4. WFB indicated that it intended to force-place another flood insurance policy. *Id*. On April 6, 2012, WFB sent Plaintiffs a letter indicating that it had purchased another flood insurance policy from QBEC, this time covering the period from December 12, 2010 to December 12, 2011. *Id*. at ¶ 28, Ex. 5. The premium was $2,375. *Id*. at ¶ 29. The policy was worthless because Plaintiffs suffered no flood losses and had no flood-related claims during the time period. *Id*. at ¶ 28. In addition, Plaintiffs had in fact been able to obtain the same amount of coverage during that time period for $1,634. *Id*. at ¶ 48 and Ex. 8.

1    Plaintiffs disputed the placement of flood insurance with WFB.  WFB's computer records

2 indicated that Plaintiffs' had flood insurance coverage during the relevant time period, but WFB

3 misplaced the physical policy documents and could not locate them.  *Id.* at ¶ 33.  Plaintiffs were able

4 to provide physical documentation of their flood insurance coverage between December 12, 2009 and

5 December 12, 2010.  *Id.*  As a result, WFB refunded the premium on the policy procured to cover that

6 time period, $2,250.  *Id.* at ¶ 34.  The charges for the second policy were never refunded, and

7 Plaintiffs were ultimately forced to pay for that policy to avoid adverse credit consequences or

8 foreclosure.  *Id.* at ¶¶ 34-36.

9    According to the National Association of Insurance Commissioners ("NAIC"), policies should

10 not be back-dated to collect premiums for a time period that has already passed because insurance is

11 prospective in nature.  *Id.* at ¶ 40 (citing Ex. 13 at 2).  Moreover, the Office of the Comptroller of

12 Currency ("OCC") has stated that "The ability to impose the costs of force placed flood insurance on

13 a borrower commences 45 days after notification to the borrower of a lack of insurance or of

14 inadequate insurance coverage.  Therefore, lenders may not charge borrowers for coverage during the

15 45-day notice period."  *Id.* at ¶ 41 (quoting Flood Insurance Questions & Answers, 74 Fed. Reg. at

16 35,934).  In addition, several courts have upheld claims that backdating force-placed insurance

17 policies is unlawful.  *Id.* at ¶ 42 (citing cases).

18    In addition, the commissions paid to WFI, and funneled to WFB, were not legitimately earned.

19 *Id.* at ¶¶ 43-44.  Rather, the commission was a kickback that induced Wells Fargo to purchase force-

20 placed flood insurance from QBE.  *Id.* at ¶ 44.  Specifically, QBEC paid approximately 40% of the

21 net written premiums to QBEF on each policy.  *Id.* at ¶ 45 (citing Ex. 14).  QBEF then paid 11% of

22 the net written premiums to WFI.  *Id.* (citing Ex. 14).  WFI passed back a substantial portion of the

23 commissions it received to WFB in connection with Wells Fargo's "soft dollars" program.  *Id.* at ¶ 46.

24    Numerous courts have found similar kickback schemes give rise to legal claims.  *Id.* at ¶ 50

25 (citing cases).  In addition, a lender or servicer's practice of accepting commissions in connection

26 with force-placed flood insurance is inconsistent with the NFIA, which only allows lenders and

27 servicers to charge the borrower for the costs of premiums and fees incurred by the lender or servicer.

28 *Id.* at ¶ 51 (citing 42 U.S.C. § 4012(e)(2); 12 C.F.R. § 22.3).  Moreover, Fannie Mae issued a

Servicing Guide Announcement ("SGA") pertaining to lender-placed insurance on March 14, 2012. *Id.* at ¶ 52 (citing Ex. 15). In the SGA, Fannie Mae stated that "reimbursement of lender-placed insurance premiums must exclude any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]" *Id.* (quoting Ex. 15 at 4) (emphasis removed). A week earlier, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") seeking to align servicer incentives with the best interest of Fannie Mae and homeowners. *Id.* at ¶ 53 (citing Ex. 16). In California, the Department of Insurance ("DOI") announced on March 14, 2012 that it had contacted the ten largest lender-placed insurers in California and asked them to reduce their rates due to questionable financial integration between lenders and insurers and the lack of arm's length transactions. *Id.* at ¶ 54 (citing Exs. 17-18). Similar concerns have been expressed by the New York Department of Financial Services, which held a three-day public hearing regarding force-placed insurance practices in May 2012. *Id.* at ¶ 55 (citing Ex. 19).

Based on the foregoing, Plaintiffs allege six causes of action on behalf of themselves and various putative classes and subclasses. *Id.* at ¶¶ 73-131; *see also* ¶¶ 57-72 (class allegations).

(1)  **Breach of Contract Against WFB**:  Plaintiffs' deed of trust, a standard Fannie Mae mortgage, does not authorize WFB to place backdated insurance for periods of time that have already expired or to arrange for commissions on behalf of itself or its affiliates in connection with force-placed insurance. *Id.* at ¶¶ 74, 76-77. WFB willfully breached the contract by engaging in both activities, causing Plaintiffs to face increased premiums, interest payments, and other charges. *Id.* at ¶¶ 79-82.

(2)  **Breach of Covenant of Good Faith and Fair Dealing Against WFB**:  WFB owed Plaintiffs a duty of good faith and fair dealing by virtue of their contractual relationship. *Id.* at ¶ 84. WFB breached that duty by improperly placing backdated force-placed insurance policies and arranging for commissions for itself and/or WFI in connection with those policies. *Id.* at ¶ 85. WFB acted willfully and in bad faith, seeking to maximize its revenue from Plaintiffs by forcing them to procure unnecessary and unauthorized insurance. *Id.* at ¶¶ 86-87. As a result, Plaintiffs suffered damages in the form of increased premiums, interest payments, and other charges. *Id.* at ¶ 88.

(3)      Violation of the UCL Against WFB and WFI:  WFB engaged in unfair business practices prohibited by the UCL by manipulating the force-placed insurance process in force-placing backdated policies, arranging for WFI to be paid commissions, and arranging to have a portion of the commissions passed back to itself.  *Id*. at ¶¶ 91-92.  WFB systematically engaged in these practices to Plaintiffs' detriment.  *Id*. at ¶ 95.  WFI engaged in unfair business practices prohibited by the UCL by assisting WFB in procuring backdated force-placed insurance coverage, accepting commissions, and passing back a portion of those commissions to WFB.  *Id*. at ¶¶ 91, 93.  These practices contravene statutory, regulatory, and legal authority.  *Id*. at ¶ 94.  The harm caused by these practices vastly outweighs any legitimate utility that they have.  *Id*. at ¶ 96.  Plaintiffs have suffered monetary harm, and seek injunctive relief, restitution, attorneys' fees, and costs.  *Id*. at ¶¶ 97-99.

(4)      Violation of the UCL Against QBEC and QBEF:  QBEC engaged in unfair business practices prohibited by the UCL by issuing backdated force-placed flood insurance policies and offering Wells Fargo commissions in connection with those policies to obtain business.  *Id*. at ¶¶ 101-02.  QBEF engaged in unfair business practices prohibited by the UCL by procuring backdated force-placed insurance policies for WFB, accepting commissions or premium splits in connection with that coverage, and offering Wells Fargo commissions in connection with force-placed insurance issued by its affiliate, QBEC, to gain business.  *Id*. at ¶¶ 101, 103.  QBE systematically engaged in these practices.  *Id*. at ¶ 105.  The practices contravene statutory, regulatory, and judicial authority.  *Id*. at ¶ 104.  The harm caused by these practices vastly outweighs any legitimate utility that they have.  *Id*. at ¶ 106.  Plaintiffs have suffered monetary harm, and seek injunctive relief, restitution, attorneys' fees, and costs.  *Id*. at ¶¶ 107-09.

(5)      Unjust Enrichment/Restitution Against WFI:  It would be unjust and inequitable to allow WFI to retain the commissions it received in connection with force-placed flood insurance policies because the commissions (1) were not legitimately earned; (2) distort the force-placed insurance process; (3) are inconsistent with the NFIA; and (4) are inconsistent with other applicable authority.  *Id*. at ¶¶ 111-14.  Where the policy is backdated, the injustice is increased because the insurance coverage offers no value to the borrower if the borrower suffered no loss during the applicable period.  *Id*. at ¶ 115.  Plaintiffs are entitled to restitution of the commission WFI received in

1    connection with the force-placed flood insurance on their property.  *Id*. at ¶ 120.  In addition, WFI

2    knew that its practices were unlawful and is therefore guilty of malice, oppression, and/or fraud

3    through its conscious disregard of Plaintiffs' rights and should therefore be liable for exemplary

4    damages.  *Id*. at ¶¶ 116-119, 121.

5          (6)    Unjust Enrichment/Restitution Against QBEC and QBEF:  QBEC received premium

6    payments in connection with fore-placed flood insurance, which it split with QBEF, at Plaintiffs'

7    expense.  *Id*. at ¶¶ 123-25.  It would be unjust to allow QBE to retain the premiums paid on backdated

8    insurance coverage because the coverage provides no real value to borrowers and QBE secured these

9    payments by offering kickbacks to Wells Fargo and other mortgage lenders and servicers.  *Id*. at ¶

10   126.  Plaintiffs are entitled to restitution of the premiums paid to QBE in connection with the

11   backdated force-placed flood insurance policies.  *Id*. at ¶ 130.  In addition, QBE knew that its conduct

12   was unjust and unlawful and is guilty of malice, oppression, and/or fraud through its willful and

13   conscious disregard of Plaintiffs' rights and should therefore be liable for exemplary damages.  *Id*. at

14   ¶¶ 127-29, 131.

15       **B.**      **The Motions to Dismiss and to Strike Plaintiffs' Request for Exemplary Damages**

16              **1.**      **Wells Fargo Motion**

17         Wells Fargo argues that Plaintiffs have not stated a claim on which relief can be granted on

18   either their general "backdating" theory or their "kickback" theory.  Wells Fargo Motion, 1.  Wells

19   Fargo also asserts that the request for exemplary damages on Plaintiffs' unjust enrichment claim is

20   inadequately pled and should be stricken.  *Id*. at 3.  For the purposes of this motion only, WFB does

21   not dispute that the individualized claim that WFB breached its contract with Plaintiffs by placing

22   insurance even though Plaintiffs maintained their own insurance at all relevant times is adequately

23   pled.  *Id*.

24         Wells Fargo contends that the backdating theory is contrary to law and contract.  *Id*. at 5-8.

25   Wells Fargo asserts that, pursuant to federal law and the typical deed of trust, mortgaged property

26   located in a designated flood hazard area must be continuously insured against risk of damage by

27   flood.  *Id*. at 5-6 (citing 42 U.S.C. § 4012a(b)(1)(A), (e)(2)).  Wells Fargo states that backdated

28   insurance policies are necessary to insure continuous coverage.  *Id*.  Wells Fargo argues that

1    backdated policies insure against any loss that occurred during the lapse in coverage, and relieve the

2    bank of any obligation to determine whether any damage in fact occurred. *Id*. at 7 (citing *Schilke v.*

3    *Wachovia Mortg., FSB*, 820 F.Supp.2d 825, 834 (N.D. Ill. 2011); *Webb v. Chase Manhattan Mortg.*

4    *Corp.*, 2008 WL 2230696, at *19 (S.D. Ohio May 28, 2008)). Wells Fargo contends that backdated

5    insurance coverage is not "worthless" because, at the time the policy is placed, it cannot know

6    whether damage occurred during the lapse and because continuous coverage is required by federal

7    law. *Id*.

8        Wells Fargo challenges the kickback theory on the bases that it is inadequately pled and

9    precluded by the filed-rate doctrine and the California Insurance Code. *Id*. at 8-11. Wells Fargo

10   states that this theory rests entirely on the conclusory allegation that the commission Wells Fargo

11   received "was not legitimately earned." *Id*. at 8 (citing Complaint, ¶ 44). Wells Fargo notes that

12   Plaintiffs do not allege that the commission exceeded the rate authorized by, and on file with, the

13   DOI. *Id*. As a result, Wells Fargo argues that the claim fails. *Id*. In any event, Wells Fargo contends

14   that the filed-rate doctrine precludes an action by a consumer where the consumer paid only the rates

15   filed with the regulatory agency. *Id*. at 8-9 (citing *MacKay v. Superior Court*, 188 Cal.App.4th 1427,

16   1448, 115 Cal.Rptr.3d 893 (2010)). Wells Fargo asserts that filed and approved rates are not subject

17   to collateral attack in court. *Id*. at 9 (citing *MacKay*, 188 Cal.App.4th at 1448, 115 Cal.Rptr.3d 893).

18   Wells Fargo argues that the challenged commissions were a component of a rate filed and approved

19   by the commissioner of the DOI. *Id*. (citing Cal. Ins. Code §§ 1861.05(a), 1858.07). In addition,

20   Wells Fargo argues that the California Insurance Code independently bars Plaintiffs' challenge to the

21   preapproved rate. *Id*. at 10 (citing Cal. Ins. Code § 1860.1). Wells Fargo argues that cases to the

22   contrary have not adequately explained their reasoning. *Id*. at 10-11 (comparing *Lyons v. First Am.*

23   *Title Ins. Co.*, 2009 WL 5195866, at *5-*7 (N.D. Cal. Dec. 22, 2009) to *Cannon v. Wells Fargo Bank,*

24   *N.A.*, __ F.Supp.2d __, 2013 WL 132450 (N.D. Cal. Jan. 9, 2013); *Ellsworth v. U.S. Bank, N.A.*, __

25   F.Supp.2d __, 2012 WL 6176905 (N.D. Cal. Dec. 11, 2012)).

26       Further, Wells Fargo asserts that all of Plaintiffs' claims are preempted by either the Home

27   Owners' Loan Act ("HOLA") or the National Bank Act ("NBA"). *Id*. at 11-15. Wells Fargo

28   contends that Plaintiffs seek to apply state law to prohibit lenders or their affiliates from receiving

United States District Court
Northern District of California

8

United States District Court
Northern District of California

1    commissions in connection with force-placed insurance and ensuring that collateral is continuously

2    insured by placing policies for periods during which the lender later learns that the borrower did not

3    maintain adequate coverage.  *Id*. at 13.  Wells Fargo argues, to the extent the HOLA applies, that

4    Plaintiffs are attempting to regulate the lender's ability to obtain insurance to protect collateral, the

5    terms of credit, loan-related fees, and servicing of mortgage loans and their claims are thus preempted.

6    *Id*. at 12-13 (citing 12 C.F.R. §§ 545.2, 560.2).  In the alternative, to the extent the NBA applies,

7    Wells Fargo argues that Plaintiffs' claims are preempted because they are attempting to use state law

8    to interfere with banking activities.  *Id*. at 14 (citing *Barnett Bank of Marion County, N.A. v. Nelson*,

9    517 U.S. 25, 32, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996); 12 C.F.R. §§ 7.4002, 34.4).  Wells Fargo

10   that HOLA should apply because the loan originated with Wachovia, a federal savings bank, but,

11   alternatively, the NBA applies because Wells Fargo is a national bank regulated by the NBA.  *Id*. at

12   11 n.11 (citing *Appling v. Wachovia Mortg., FSB*, 745 F.Supp.2d 961, 971 (N.D. Cal. 2008)).

13          Next, Wells Fargo argues that WFB was authorized to undertake the challenged practices by

14   the DOT.  *Id*. at 15-16.  Wells Fargo states that the DOT authorizes WFB to place insurance in the

15   event that any borrower fails to maintain adequate coverage.  *Id*. at 15 (citing DOT, ¶ 5).  Wells Fargo

16   argues that WFB acted within that authority by force-placing insurance here.  Moreover, Wells Fargo

17   argues that WFB was further allowed to do so by language in the DOT stating:  "[T]he absence of

18   express authority in this Security Instrument to charge a specific fee to Borrower shall not be

19   construed as a prohibition on the charging of such fee."  *Id*. at 16 (citing DOT, ¶ 16).  Wells Fargo

20   also argues that Plaintiffs' unjust enrichment/restitution claim against WFI fails because its remedy,

21   restitution, is already sought under Plaintiffs' UCL cause of action.  *Id*. at 16-17.

22          Finally, Wells Fargo contends that Plaintiffs' request for exemplary damages against WFI

23   pursuant to the unjust enrichment/restitution cause of action should be stricken as an end run around

24   the absence of exemplary damages under the UCL.  *Id*. at 17-19.  Moreover, Wells Fargo argues that

25   Plaintiffs have not, and cannot, allege that WFI engaged in conduct with the required degree of

26   culpability.  *Id*. at 18-19 (citing Cal. Civ. Code § 3924(a)).

27   //

28   //

9

2. **QBE Motion**

The QBE Motion raises arguments that cover some of the same ground as those in the Wells Fargo Motions.  The Court only highlights relevant differences.

First, regarding the filed-rate doctrine, QBE asserts that QBEIC is an admitted insurance carrier in California whose flood lender-placed insurance rates have been filed with and approved by the DOI pursuant to the California statutory scheme.  QBE Motion, 6 (citing QBEIC California Rate Filing; Cal. Ins. Code §§ 1861.05(a)-(b), 1857.7(11)).  QBE argues that Plaintiffs' claims against QBEIC and QBEF are premised on the sole allegation that Plaintiffs were forced to overpay for flood insurance.  *Id*. at 7.  QBE contends that these claims are precluded by the filed-rate doctrine.  *Id*.

Second, QBE asserts that the filed-rate doctrine bars Plaintiffs' UCL claim because payment of premiums based on field rates is not an injury.  *Id*. at 9.  In addition, QBE argues that Plaintiff have not alleged conduct that violates the UCL.  *Id*. at 9-16.  To the extent that Plaintiffs UCL claim is tethered to a violation of the NFIA, QBE contends that the NFIA does not apply to it and does not forbid any of the alleged practices and instead requires the continuous flood coverage provided by retroactive placement of flood insurance.  *Id*. at 10-12 (citing 42 U.S.C. § 4012a; 12 C.F.R. § 22.3).  Moreover, QBE argues that Plaintiffs cannot succeed under any balancing required by the UCL because they have suffered no cognizable injury.  *Id*. at 13-15.  In addition to its previous arguments concerning the filed-rate doctrine, QBE also asserts that backdated flood insurance has utility because it insures against liability for any loss that occurred during a lapse in coverage regardless of when the loss occurred in the absence of a backdated policy.  *Id*. at 13-14.  QBE argues that this utility has been recognized by federal law, the DOT, government-sponsored investors in the secondary mortgage market, insurance regulatory support organizations, and the courts.  *Id*. at 14-15.  Last, QBE asserts that Plaintiffs cannot satisfy the *Camacho* test because they could have avoided the force-placement of insurance by obtaining their own coverage.  *Id*. at 16 (citing *Camacho v. Auto. Club of S. Cal.*, 142 Cal.App.4th 1394, 48 Cal.Rptr.3d 770, 777 (2006)).

Third, QBE argues that Plaintiffs' unjust enrichment/restitution claim is barred as duplicative of its UCL claim, is barred because it is governed by the DOT, and because any payment QBE received was not unjust as the rates were approved and filed.  *Id*. at 17-20.

1    Fourth, QBE argues that Plaintiffs have not alleged conduct that would entitle them to

2    exemplary damages. *Id*. at 20.

3    **C.    Opposition**

4    Plaintiffs filed Oppositions to each Motion to Dismiss.  First, Plaintiffs argue that their claims

5    are not barred by the filed-rate doctrine or the California Insurance Code.  Opposition to Wells Fargo

6    Motion ("Opposition to Wells"), 23-24; Opposition to QBE Motion ("Opposition to QBE"), 19-22.

7    As to Wells Fargo, Plaintiffs argue that the filed-rate doctrine does not apply because it does not file

8    rates with the DOI.  Opposition to Wells, 23.  As to QBE, Plaintiffs argue that there is no common

9    law filed-rate doctrine in California.  Opposition to QBE, 19 (citing *Ellsworth*, __ F.Supp.2d __, 2012

10   WL 6176905, at *12).  Turning to the Insurance Code, Plaintiffs state that section 1861.03 proives

11   that "[t]he business of insurance shall be subject to the laws of California applicable to any other

12   business, including, but not limited to … unfair business practices laws[.]"  Opposition to Wells, 23-

13   24; Opposition to QBE, 20 (citing *Wahl v. Am. Sercurity Ins. Co.*, 2010 WL 4509814, at *2 (N.D. Cal.

14   Nov. 1, 2010) ("*Wahl II*") (quoting Cal. Ins. Code § 1861.03(a)).  Plaintiffs recognize that section

15   1860.1 creates a limited exception for a claim that directly challenges a rate, but argue that the

16   exception is very narrow.  Opposition to Wells, 24; Opposition to QBE, 20 (citing *Wahl II*, 2010 WL

17   4509814, at *2).  Plaintiffs assert that they are challenging the manipulation of the force-placed

18   insurance process, not any rates filed with the DOI.  Opposition to Wells, 24; Opposition to QBE, 20.

19   They argue that their backdating allegations have nothing to do with the rate.  Opposition to Wells,

20   24; Opposition to QBE, 20.  They also argue that their kickback allegations are not the same as a

21   challenge to the rate, incorporating the reasoning of several district court opinions.  Opposition to

22   Wells, 24; Opposition to QBE, 20-21 (collecting cases in support of the proposition that they are not

23   challenging the rate itself, but Defendants' practices of receiving kickbacks).

24   Second, Plaintiffs argue that their claims against Wells Fargo are not preempted.  Opposition

25   to Wells, 16-22.  Plaintiffs assert that the NBA, not the HOLA, is the applicable statute.  *Id*. at 17

26   (distinguishing *Appling*, cited by Wells Fargo, on the ground that, in that case, the plaintiffs asserted

27   claims against Wells Fargo as the successor-in-interest to Wachovia based on allegedly wrongful

28   conduct by Wachovia, whereas here Plaintiffs assert direct claims arising out of Wells Fargo's

United States District Court
Northern District of California

11

conduct) (citing *Avila v. Wells Fargo Bank, N.A.*, 2012 WL 2953117, at *11 (N.D. Cal. July 19, 2012); *Ramirez v. Wells Fargo Bank, N.A.*, 2011 WL 1585075, at *7 (N.D. Cal. Apr. 27, 2011)). Plaintiffs contend that their claims are not preempted because they assert contract or tort claims of general applicability not targeted at banking activity that, in addition, fall within the exemption for laws that "the OCC determines to be applicable to national banks." *Id.* at 18-20 (citing 12 C.F.R. § 34.4; *Barnett Bank*, 517 U.S. at 33, 116 S.Ct. 1103, 134 L.Ed.2d 237). Plaintiffs specify that they are not challenging Wells Fargo's ability to force place insurance, only the manner in which Wells Fargo exercised that ability. *Id.* at 19. Plaintiffs also address HOLA preemption, arguing that their claims are contract and tort claims that only incidentally affect lending operations, and thus are not preempted. *Id.* at 21-22 (citing 12 C.F.R. § 560.2(c)(1), (4), (6); *Gibson v. World Sav. & Loan Ass'n*, 103 Cal.App.4th 1291, 128 Cal.Rptr.2d 19 (2002)).

Third, Plaintiffs contend that they have adequately pled their claims for exemplary damages. Opposition to Wells, 25; Opposition to QBE, 22-23. Plaintiffs assert that exemplary damages are available in connection with a claim for unjust enrichment and that they have alleged that WFI and QBE engaged in a systematic scheme to manipulate the force-placed insurance process and backdate policies knowing that their practices were unjust. Opposition to Wells, 25; Opposition to QBE, 23. Plaintiffs contend that this is sufficient to plead exemplary damages, and in any event it would be premature to rule on the merits of their allegations and decide whether exemplary damages can be awarded at this stage. Opposition to Wells, 25; Opposition to QBE, 23.

Fourth, Plaintiffs argue that each of their causes of action is well-pled, as follows:

(1)      Breach of Contract Against WFB: Plaintiffs argue that Wells Fargo exceeded its authority to force place insurance, provided by paragraph 5 of the DOT, because the contract does not authorize backdating or kickbacks. Opposition to Wells, 5-6 (citing *McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F.Supp.2d 928, 955-56 (N.D. Cal. 2012)). Moreover, Plaintiffs argue that Wells Fargo exceeded its authority to "do and pay for whatever is reasonable and appropriate to protect Lender's Interest in the Property and rights under [the] Security Instrument," provided by paragraph 9 of the DOT, because such language could be held as explicitly restricting lender's discretion to force-place insurance. *Id.* at 6-10 (citing *McNeary*, 863 F.Supp.2d at 956). Plaintiffs

assert that they have adequately alleged that the kickbacks scheme and backdating were not reasonable or appropriate. *Id*. at 7-10. As to backdating, Plaintiffs contend that it is not reasonable and appropriate to charge borrowers for coverage that applies before a notice of deficiency was ever provided. *Id*. at 9 (citing *Lane v. Wells Fargo Bank, N.A.*, 2013 WL 1758878, at *2 (N.D. Cal. Apr. 24, 2013) ("*Lane II*"); *Ellsworth*, 2012 WL 6176905, at *12). To the extent Wells Fargo relies on the Biggert-Waters Flood Insurance Reform Act, Plaintiffs states that it did not become effective until January 1, 2013, and was not in effect at the time of the alleged backdating. *Id*. at 10 (citing *Lane II*, 2013 WL 1758878, at *3).

(2)     Breach of Covenant of Good Faith and Fair Dealing Against WFB: Plaintiffs argue that the alleged kickbacks and backdating violate the covenant of good faith and fair dealing. *Id*. at 11-13 (citing *McNeary*, 863 F.Supp.2d at 956-59, 962).

(3)     Violation of the UCL Against WFB and WFI: Plaintiffs state that a number of courts have refused to dismiss UCL claims based on similar allegations. *Id*. at 13-14 (collecting cases).

(4)     Violation of the UCL Against QBEC and QBEF: Plaintiffs contend that they have satisfied each of the three tests for unfairness, although they need only satisfy one. Opposition to QBE, 7-15. First, they assert that their kickback allegations satisfy the tethering test because the alleged kickback scheme is inconsistent with (1) the NFIA; (2) the regulations of the Federal Housing Finance Agency ("FHFA"); (3) a March 14, 2012 Fannie Mae SGA; (4) a March 6, 2012 Fannie Mae RFP; (5) criticism of such arrangements by DOI; (6) statements by the New York Department of Financial Services ("NYDFS"); and (7) a consent order entered between NYDFS and QBE on April 18, 2013 and attached to the Opposition. *Id*. at 8-11. Second, Plaintiffs argue that their backdating allegations satisfy the same test because the relying on (1) a recent statement from NAIC that policies "should not be back-dated to collect premiums for a time period that has already passed[;]" and (2) NFIA requirements cited in the Complaint. *Id*. at 11-12. Third, Plaintiffs argue that they have satisfied the balancing test because the alleged wrongful kickbacks and backdating serve no useful purpose and cause great harm to the consumer. *Id*. at 13-14. In support of this point, Plaintiffs contend that the backdated policies were fully expired and placed at a time that it was obvious no flood losses had occurred and, in any event, Plaintiffs had maintained coverage throughout. *Id*.

United States District Court
Northern District of California

13

United States District Court
Northern District of California

1   Fourth, Plaintiffs argue that they satisfy the FTC Test[2] because they could not have reasonably

2   avoided the injury and, as discussed above, the substantial injury outweighed any countervailing

3   benefits to consumers or competition.  *Id*. at 14-15.  Plaintiffs assert that force-placed insurance is

4   unavoidable because it is involuntary and, in addition, they could not have avoided force-placement

5   by obtaining insurance because insurance was force-placed even though they did obtain insurance.  *Id*.

6        (5)    Unjust Enrichment/Restitution Against WFI:  Plaintiffs argue that their unjust

7   enrichment/restitution claim is valid and is not duplicative of their UCL claim because each has

8   separate elements and because it is inappropriate at this stage of the litigation to determine which

9   remedies available to Plaintiffs are adequate.  Opposition to Wells, 15 (citing *Nordberg v. Trilegiant*

10  *Corp.*, 445 F.Supp.2d 1082, 1100-01 (N.D. Cal. 2006); *Keilholtz v. Superior Fireplace Co.*, 2009 WL

11  839076, at *5 (N.D. Cal. Mar. 20, 2009)).  Further, Plaintiffs argue that their claim is not precluded by

12  contract because they have no contract with WFI and, even if they did, the contract does not authorize

13  the alleged conduct and they should be allowed to plead this claim in the alternative.  *Id*. at 16.

14       (6)    Unjust Enrichment/Restitution Against QBEC and QBEF:  Plaintiffs make similar

15  arguments, at more length, in support of their unjust enrichment/restitution claim against QBE.

16  Opposition to QBE, 15-19.  Plaintiffs add that this claim against QBE is not duplicative of their UCL

17  claim against QBE for the additional reason that this claim is alleged on behalf of a nationwide class,

18  as opposed to a class limited to California residents.  *Id*. at 17.

19      **D.**    **Replies**

20          **1.**    **Wells Fargo Reply**

21       First, Wells Fargo argues that backdated insurance policies are necessary to protect lenders

22  from risks associated with lapses in flood insurance and authorized by the NFIA, CFPB, and contract.

23  Wells Fargo's Reply in Support of Wells Fargo Motion ("Wells Fargo Reply"), 1-4 (citing *Webb*,

24  2008 WL 2230696, at *19; *Schilke*, 820 F.Supp.2d at 834).  Second, Wells Fargo asserts that

25  Plaintiffs' kickback claims are precluded by the filed-rate doctrine and the California Insurance Code.

26  *Id*. at 4-7 (citing *Roberts v. Wells Fargo Bank, N.A.*, 2013 WL 1233268, at *12-*13 (S.D. Ga. Mar.

27  27, 2013); *Lyons*, 2009 WL 5195866, at *5-*7; *Roussin v. AARP, Inc.*, 664 F.Supp.2d 412 (S.D.N.Y.

28

---

[2] Plaintiffs state that what QBE refers to as the *Camacho* test is called the FTC Test.  Opposition to QBE, 9 n.11.

14

2009) *aff'd*, 379 Fed.Appx. 30 (2d Cir. May 26, 2010)).  Third, Wells Fargo contends that either

HOLA or the NBA preempt Plaintiffs' claims because Plaintiffs seek to prevent banks from obtaining

collateral-protection insurance during periods of lapse and limit banks' ability to set or assess fees.

*Id*. at 7-9 (citing *Martinez v. Wells Fargo Home Mortg., Inc.*, 598 F.3d 549 (9th Cir. 2010); *Mellon*

*Bank, N.A. v. Foster*, 1990 WL 10007676, at *5 (W.D. Pa. May 31, 1990); *Silverstein v. ING Bank,*

*FSB*, 2012 WL 4340587 (D. Mass. Sept. 21, 2012)).  Wells Fargo asserts that HOLA provides the

proper lens.  *Id*. at 7 n.9 (citing *Haggarty v. Wells Fargo Bank, N.A.*, 2011 WL 445183, at *4 (N.D.

Cal. Feb. 2, 2011)).  Fourth, Wells Fargo reiterates its arguments attacking Plaintiffs' breach of

contract claim to the extent it relies on the above theories, Plaintiffs' unjust enrichment claim,

Plaintiffs' request for exemplary damages, and Plaintiffs' UCL claim.  *Id*. at 10-12.

### 2. QBE Reply

First, QBE argues that Plaintiffs' kickback claims are barred by the filed-rate doctrine and the

California Insurance Code.  QBE's Reply in Support of QBE Motion ("QBE Reply"), 2-6 (citing

*MacKay*, 188 Cal.App.4th 1427, 115 Cal.Rptr.3d 893; *Kunzlemann v. Wells Fargo Bank, N.A.*, 2013

WL 139913, at *12 (S.D. Fla. Jan. 10, 2013); *Roberts*, 2013 WL 1233268, at *13).  Second, QBE

contends that Plaintiffs have not stated a claim under the UCL's unfair prong because they have not

established an injury in fact or alleged unfair conduct under any pertinent test.  *Id*. at 6-10.  Third,

QBE reiterates its arguments challenging Plaintiffs' unjust enrichment/restitution claim and Plaintiffs'

request for exemplary damages.  *Id*. at 10-14.

### III. REQUEST FOR JUDICIAL NOTICE

The standard for judicial notice is set forth in Rule 201 of the Federal Rules of Evidence,

which allows a court to take judicial notice of an adjudicative fact not subject to "reasonable dispute,"

either because it is "generally known within the territorial jurisdiction of the trial court" or it is

"capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably

be questioned." Fed. R. Evid. 201. As a general rule, the court "may not consider any material beyond

the pleadings in ruling on a Rule 12(b)(6) motion." *U.S. v. Corinthian Colleges*, 655 F.3d 984, 998-99

(9th Cir. 2011) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)). However, the

court may consider unattached evidence on which the complaint "necessarily relies" if: "(1) the

1  complaint refers to the document; (2) the document is central to plaintiff's claim; and (3) no party

2  questions the authenticity of the document." *Id*. at 999 (citing *Marder v. Lopez*, 450 F.3d 445, 448

3  (9th Cir. 2006)). In addition, the court may take judicial notice of "matters of public record," but not

4  facts that may be "subject to reasonable dispute." *Id*. (citing *Lee*, 250 F.3d at 689).

5      QBE requests judicial notice of the QBEC rate filing as a matter of public record. QBE

6  Motion, 7 n.6. Plaintiffs oppose judicial notice as an improper attempt to introduce evidence outside

7  the pleadings. Opposition to QBE, 22. Plaintiffs make no attempt to dispute that QBEC rate filing.

8  Indeed, Plaintiffs concede that QBEC included commissions and brokerage expenses in their filings

9  with CA-DOI. *Id*. The Court takes judicial notice of the QBEC rate filing as a matter of public

10  record that is not subject to reasonable dispute.

## IV.    ANALYSIS

### A.    Legal Standard

13      A complaint may be dismissed for failure to state a claim for which relief can be granted

14  under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). "The purpose

15  of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint." *N. Star*

16  *Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). Generally, a plaintiff's burden at the

17  pleading stage is relatively light. Rule 8(a) of the Federal Rules of Civil Procedure states that "[a]

18  pleading which sets forth a claim for relief . . . shall contain . . . a short and plain statement of the

19  claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

20      In ruling on a motion to dismiss under Rule 12, the court analyzes the complaint and takes

21  "all allegations of material fact as true and construe[s] them in the light most favorable to the non-

22  moving party." *Parks Sch. of Bus. v. Symington,* 51 F.3d 1480, 1484 (9th Cir. 1995). Dismissal may

23  be based on a lack of a cognizable legal theory or on the absence of facts that would support a valid

24  theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A complaint must

25  "contain either direct or inferential allegations respecting all the material elements necessary to

26  sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562

27  (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)). "A

28  pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of

1    action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at

2    555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

3    enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

4         The factual allegations must be definite enough to "raise a right to relief above the

5    speculative level."  *Twombly*, 550 U.S. at 555.  However, a complaint does not need detailed factual

6    allegations to survive dismissal.  *Id.*  Rather, a complaint need only include enough facts to state a

7    claim that is "plausible on its face."  *Id.* at 570.  That is, the pleadings must contain factual

8    allegations "plausibly suggesting (not merely consistent with)" a right to relief.  *Id.* at 545 (noting

9    that this requirement is consistent with Fed. R. Civ. P. 8(a)(2), which requires that the pleadings

10   demonstrate that "the pleader is entitled to relief").

**B.     Preemption**

12        As discussed below, the Court concludes that preemption is properly analyzed under the NBA.

13   Further, the Court concludes that the NBA does not preempt Plaintiffs' claims in this case.

**1.     Applicability of the HOLA and the NBA**

15        The Court concludes that the issue of preemption is governed by the NBA in this case because

16   Plaintiffs' claims arise entirely out of Wells Fargo's conduct occurring after Wells Fargo merged with

17   Wachovia.

18        Federal savings associations, including federal savings banks, are subject to HOLA and

19   regulated by the Office of Thrift Supervision ("OTS").  12 U.S.C. § 1464; *Silvas v. E*Trade Mortg.*

20   *Corp.*, 514 F.3d 1001, 1005 (9th Cir. 2008).  In contrast, federally chartered banks are subject to

21   regulation by the OCC under the NBA.  *See Bank of America v. City and County of San Francisco*,

22   309 F.3d 551, 561-62 (9th Cir. 2002).  Several district courts have addressed whether the preemption

23   provisions of the HOLA or the NBA apply to claims brought against Wells Fargo, a national bank

24   regulated under the NBA, where the underlying mortgage agreement was made between Plaintiffs and

25   Wachovia, a federal savings bank regulated under the HOLA.

26        A number of courts in this district concluded that HOLA preemption applies to all loans

27   originated by a federal savings bank which was therefore subject to the requirements set forth in

28   HOLA and OTS regulations.  *See Appling*, 745 F.Supp.2d at 970-71 (applying HOLA preemption

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1  standards to state law claims brought against Wells Fargo arising out of the origination of the

2  plaintiff's loan with Wachovia; stating "this action is … governed by HOLA because Plaintiff's loan

3  originated with a federal savings bank and was therefore subject to the requirements set forth in

4  HOLA and OTS regulations"); *Haggarty v. Wells Fargo Bank, N.A.*, 2011 WL 445183, at *4 (N.D.

5  Cal. Feb. 2, 2011) (same result).  At least one court in another district has rejected this line of cases,

6  reaching the opposite conclusion that HOLA preemption cannot apply to a national bank.  *See Gerber*

7  *v. Wells Fargo Bank, N.A.*, 2012 WL 413997, at *4 (D. Ariz. Feb. 9, 2012) (holding that HOLA

8  preemption does not apply to Wells Fargo because it is not a federal savings association).  Several

9  other courts, including at least one court in this district, have taken a middle position.  Those courts

10  have concluded that the NBA governs the preemption analysis where claims arose out of actions taken

11  by Wells Fargo, a national bank, after it merged with Wachovia, a federal savings bank, but HOLA

12  governs claims arising out of Wachovia's conduct, including origination of the loan, occurring prior

13  to the merger.  *See Ramirez*, 2011 WL 1585075, at *7 (stating that the NBA governs preemption of

14  claims raised arising out of conduct, an alleged promise to propose a pending foreclosure sale, that

15  occurred after the November 2009 merger between Wachovia and Wells Fargo); *Valtierra v. Wells*

16  *Fargo Bank, N.A.*, 2011 WL 590596, at *3-*4 (E.D. Cal. Feb. 10, 2011) (noting mixed case law;

17  holding that occurrences prior to November 1, 2009 were governed by HOLA and occurrences

18  occurring after that date were not; refusing to apply HOLA preemption to an undated letter and

19  discussions occurring at an unknown date in the context of a motion to dismiss); *Hopkins v. Wells*

20  *Fargo Bank, N.A.*, 2013 WL 2253837, at *3 (E.D. Cal. May 22, 2013) (noting the three lines of cases

21  and holding that, on the record before that court, Wells Fargo could not assert HOLA preemption as a

22  defense against claims occurring after its merger with Wachovia in the context of a motion to

23  dismiss); *Scott v. Wells Fargo Bank, N.A.*, 2011 WL 3837077, at *4-*5 (D. Minn. Aug. 29, 2011)

24  (following as persuasive the reasoning of *Valtierra* and choosing not to follow *DeLeon* and

25  *Haggarty*).

26      In *Scott*, the court reasoned that any actions taken after Wachovia merged with Wells Fargo

27  were taken by Wells Fargo, a national bank whose dealings are governed by the NBA, not HOLA.

28  *Scott*, 2011 WL 3837077, at *5.  Here, Plaintiffs claims rely on conduct by Wells Fargo that began in

2012, well after Plaintiffs alleged that Wells Fargo acquired Wachovia.  The parties do not dispute that Wells Fargo is a national bank governed by the NBA.  Finding the cases relying on the timing of the challenged conduct persuasive, the Court concludes that the preemption provisions of the NBA apply to this case.

### 2.   Legal Standard Governing Preemption Pursuant to the NBA

"The [NBA] vests nationally chartered banks with enumerated powers, such as the power to make contracts, receive deposits, and to make loans, together with 'all such incidental powers as shall be necessary to carry on the business of banking.'"  *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 722 (9th Cir. 2012) (quoting 12 U.S.C. § 24 (Seventh)).  "States are permitted to regulate the activities of national banks where doing so does not prevent or significantly interfere with the national bank's or the national bank regulator's exercise of its powers."  *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 12, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007).  "But when state prescriptions significantly impair the exercise of authority, enumerated or incidental under the NBA, the State's regulations must give way."  *Id.* (citing *Barnett Bank*, 517 U.S. at 32-34, 116 S.Ct. 1103, 134 L.Ed.2d 237).

The OCC "has the power to promulgate regulations and use its rulemaking authority to define the 'incidental powers' of national banks beyond those specifically enumerated in the statute."  *Martinez*, 598 F.3d at 555 (citing 12 U.S.C. § 93(a) (OCC authorized to "prescribe rules and regulations to carry out the responsibilities of the office").  "OCC regulations possess the same preemptive effect as the [NBA] itself."  *Id.*

The NBA and OCC regulations do not preempt the entire field of banking.  *Id.*  "Federally chartered banks are subject to state laws of general application in their daily business to the extent that such laws do not conflict with the letter or the general purposes of the act."  *Watters*, 550 U.S. at 11, 127 S.Ct. 1559, 167 L.Ed.2d 389.

Pursuant to OCC regulations:

(a)  A national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning:

…

    (2)  The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;

…

    (4)  The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

…

    (10)  Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

…

(b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent consistent with the decision of the Supreme Court in *Barnett Bank*…:

    (1)  Contracts;
    (2)  Torts;

…

    (9)  Any other law that the OCC determines to be applicable to national banks in accordance with the decision of the Supreme Court in *Barnett Bank*…, or that is made applicable by Federal law.

12 C.F.R. § 34.4.

    In addition, "[s]tate laws purporting to regulate national bank fees and charges that do not constitute interest are addressed in 12 C.F.R. 7.4002". 12 C.F.R. § 34.4(a)(12) n.1. Section 7.4002 provides that "[t]he establishment of non-interest charges and fees, their amounts, and the methods of calculating them are business decisions to be made by each bank, in its discretion, according to sound banking judgment and safe and sound banking principles" guided by the bank's consideration of several enumerated factors, among others. 12 C.F.R. § 7.4002(b)(2). "The OCC applies preemption principles derived from the United State Constitution, as interpreted through judicial precedent, when determining whether State laws apply that purport to limit or prohibit charges and fees described in this section." 12 C.F.R. § 7.4002(d).

    In *Martinez*, the Ninth Circuit found that the OCC regulations implementing the NBA preempted the plaintiffs' claims brought under the UCL. *Martinez*, 598 F.3d at 554-57. The plaintiffs' claims were predicated on the defendant's alleged conduct in charging excessive underwriting fees not reasonably related to its actual costs and in marking up tax service fees. *Id*. at 552, 554. In relevant part, the Ninth Circuit held that the plaintiffs' claims were preempted by 12 C.F.R. § 7.4002(b)(2) because, "[i]n essence, [the plaintiffs] argue that the[] fees are too high, and ask the court to decide how much an appropriate fee would be. However, the OCC has clearly provided

1   how fees are to be determined.  Under 12 C.F.R. § 7.4002(b)(2), these are business decisions to be

2   made by each bank."  *Id*. at 556.

3          The Ninth Circuit again addressed NBA preemption of UCL claims in *Gutierrez*.  That case

4   involved Wells Fargo's (1) policy of posting debit transactions from high-to-low so as to maximize

5   overdraft charges; (2) failure to disclose its policy to consumers; and (3) misleading statements to the

6   effect that debit transactions would be posted in the order they made by the consumer.  *Gutierrez*, 704

7   F.3d at 723-28.  The district court found that the NBA did not preempt the plaintiffs' UCL claims as

8   to any of this conduct.  *Id*. at 723, 725.  The Ninth Circuit reversed in part and affirmed in part,

9   holding that the first two theories were preempted and the third theory was not.  *Id*. at 723-28.  In

10  relevant part, the court held that 12 C.F.R. § 7.4002(b) preempted the plaintiffs' challenge to Wells

11  Fargo's high-to-low posting order.  *Id*. at 723-24.[3]  Citing OCC letters interpreting § 7.4002, the court

12  reasoned that "federal law authorizes national banks to establish a posting order as part and parcel of

13  setting fees, which is a pricing decision."  *Id*. at 724.  The court ruled that the "district court is not free

14  to disregard the OCC's determinations of what constitutes a legitimate pricing decision, nor can it

15  apply state law in a way that interferes with this enumerated and incidental power of national banks.

16  *Id*. at 725.  On the other hand, the Ninth Circuit rejected Wells Fargo's argument that the third theory

17  was preempted by its deposit-taking power.  *Id*. at 726-28.  Noting that the NBA and OCC provisions

18  do not regulate deceptive statements vis-à-vis the bank's chosen posting method, the court held that

19  California's prohibition of misleading statements does not significantly interfere with the bank's

20  ability to offer checking account services, choose a posting method, or calculate fees.  *Id*. at 727.

21         Several recent decisions in this district have addressed whether the NBA and related OCC

22  provisions preempt kickback and backdating allegations closely analogous to those in this case.  *See*

23  *Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *8-*12 (both kickback and backdating claims not

24  preempted), *Cannon*, __ F.Supp.2d __, 2013 WL 132450, at *19-*21 (both kickback and backdating

25  claims not preempted), *Lane*, 2013 WL 269133, at *13 (kickback claims not preempted, did not reach

26  question of whether backdating claims were preempted).

27

28  _____

[3] The Ninth Circuit also held that the first and second theories were preempted pursuant to the national bank's deposit-taking power, which is not at issue in this action.  *See Gutierrez*, 704 F.3d at 723, 726.

United States District Court
Northern District of California

1    In *Ellsworth*, the court began by rejecting the defendant national bank's argument that the

2    plaintiff's kickback allegations were contrary to its fee setting power. *Ellsworth*, __ F.Supp.2d __,

3    2012 WL 6176905, at \*9-\*10. Following *Martinez*, the *Ellsworth* court looked to whether the

4    challenged conduct was at core about fees because, if it was, the plaintiff's claims would be

5    preempted. *Id*. at \*9. The court concluded that the plaintiff was not challenging the defendant's right

6    to establish or charge fees, but the defendant's practice of selecting a specific insurance carrier in

7    order to earn compensation for itself through a kickback arrangement. *Id*. On this distinction, the

8    court held that the plaintiff's kickback theory was not preempted. *Id*. at \*10. Notably, *Ellsworth* was

9    decided before the Ninth Circuit's decision in *Gutierrez*, and cited the reversed portion of the district

10   court's opinion in *Gutierrez* as persuasive authority supporting this conclusion. *Id*. In addition, the

11   *Ellsworth* court held that the challenge to the alleged kickbacks was not preempted by the NBA's real

12   estate lending powers because the claims did not obstruct, impair, or condition the defendant's ability

13   to exercise those powers. *Id*. at \*11.

14   *Ellsworth* also held that the plaintiff's backdating allegations were not preempted. *Ellsworth*,

15   __ F.Supp.2d __, 2012 WL 6176905, at \*12. In reaching this result, the court rejected Defendant's

16   argument that the claims interfered with its ability to obtain insurance for collateral by reasoning that

17   the defendant's argument that the NFIA's continuous coverage requirement authorized backdated

18   insurance was "not … unassailable." *Id*. (citing 12 C.F.R. §§ 22.3, 22.7, 34.4(a)(2)).

19   *Lane*, decided after the Ninth Circuit's opinion in *Gutierrez*, reached the same result as the

20   court in *Ellsworth* as to the kickback claims.[4] In *Lane*, the plaintiffs' claims were premised on

21   allegations that the defendant breached its contract with the plaintiffs by receiving a kickback for

22   force placed insurance and charged the plaintiffs for a commission that it had actually received

23   through an affiliate. *Lane*, 2013 WL 269133, at \*13. As in *Ellsworth*, the court reasoned that the core

24   of the plaintiffs' claims did not affect the defendant's ability to set fees or prices. *Id*. Rather, the

25   court concluded that the core of the allegations was that the defendant charged the plaintiffs for work

26   that it neither actually performed nor paid for. *Id*. The court reasoned that, as in *Gutierrez*, the

27   defendant had not pointed to any provision of the NBA or OCC regulation that "regulates deceptive

28   _____
     [4] *Lane* did not address preemption of backdating allegations analogous to those in this case, whereas, as discussed above, *Ellsworth* held that such allegations were not preempted.

statements vis-à-vis the bank's [charging of commissions]." *Id.* (quoting *Gutierrez*, 704 F.3d at 727). Moreover, the court found that the defendant had not demonstrated that refraining from the challenged wrongful conduct would "prevent or significantly interfere with its ability to engage in the business of banking." *Id.* (quoting *Gutierrez*, 704 F.3d at 727).

In *Cannon*, the court simultaneously rejected the defendant's preemption argument as applied to both kickback and backdating theories. *Cannon*, __ F.Supp.2d __, 2013 WL 132450, at \*19-\*21. First, the court held that 12 C.F.R. § 34.4 was inapplicable because the defendant merely serviced the plaintiffs' loan. *Id.* at \*20. Second, the court concluded that there was no preemption under 12 C.F.R. § 7.4002 because the plaintiffs did not challenge the defendant's authority to force-place insurance or the fees charged but the defendant's manipulation of the force placement process. *Id.*

### 3.    NFIA Background

Under the NFIA and the Flood Disaster Protection Act of 1973, as amended, the OCC is charged with promulgating regulations that require lending institutions and servicers to ensure that properties subject to their mortgage loans have adequate flood insurance. *See* 42 U.S.C. §§ 4012a(b)(1), 4003(a)(5). The NFIA prohibits lenders from issuing loans for any property unless flood insurance is in place "for the term of the loan." 42 U.S.C. § 4012a(b)(1)(A); *see also*, 12 C.F.R. § 22.3(a); 12 C.F.R. § 22.2(b). While the plain language suggests that continuous coverage is necessary, the plain language of the statute does not require backdating force-placed insurance and charging borrowers the cost.

The NFIA permits lenders to force-place flood insurance in areas with special flood hazards after providing notice to the borrower. 42 U.S.C. § 4012a(e)(1). In the version of the statute applicable to this case provided: "If the borrower fails to purchase such flood insurance within 45 days notification … the lender or servicer for the loan shall purchase the insurance on behalf of the borrower and may charge the borrower for the cost of the premiums and fees incurred by the lender or servicer for the loan in purchasing insurance." 42 U.S.C. § 4012a(e)(2) (2012).

This statute, however, neither requires nor expressly permits the lender to backdate force-placed insurance. In late 2011, the OCC and various other banking agencies issued a new guidance regarding continuous coverage of force-placed insurance. Interagency Questions and Answers

1   Regarding Flood Insurance, 76 Fed.Reg. 64175, 64180 (Oct. 17, 2011).  The guidance stated that a

2   servicer may charge a borrower for expired insurance during the notice period "if the borrower has

3   given … its servicer the express authority to charge the borrower for such coverage as a contractual

4   condition of the loan being made."  *Id*.  Thus, the agency interpretation appears to have been that the

5   statute did not require backdated flood insurance.  Moreover, it only allowed backdated flood

6   insurance covering the notification period where the parties agreed to such backdated policies by

7   contract.

8           Wells Fargo urges the Court to consider the current version of the statute, which went into

9   effect in January 2013 and expressly allows backdating.  42 U.S.C. § 4012a(e)(2).  Citing House

10  Report No. 112-102 (2011), Wells Fargo asserts that the statute did not change the law, but clarified

11  existing law.  But in *Lane II*, a court in this district persuasively rejected that argument noting that the

12  House Report was part of a different bill that never passed the Senate and never became law, and

13  therefore has little persuasive value in interpreting the law that Congress did enact, much less the

14  previous law.  *See Lane II*, 2013 WL 1758878, at *3.

15          Wells Fargo also argues that a recent comment from the Consumer Financial Protection Board

16  ("CFPB") that permits retroactive force-placement of hazard insurance policies should guide

17  interpretation of the relevant statute.  *See* Mortgage Servicing Rules, 78 Fed.Reg. 10696, 10891-92

18  (Feb. 14, 2013).  As pointed out persuasively in *Lane II*, the comment will not go into effect until

19  January 2014 and does not clarify past law.  *See Lane II*, 2013 WL 1758878, at *3.

20          Based on the foregoing, the court in *Lane II* held that federal law did not require backdating of

21  insurance during the time period relevant to this case.  *See id*.  Likewise, in *Ellsworth*, the court held

22  that backdating force-placed flood insurance policies may be inconsistent with the relevant statutory

23  regime.  *See Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *12, *21.  This Court concludes, as a

24  matter of law, that the NFIA did not require lenders to backdate force-placed flood insurance policies,

25  nor did it authorize them to do so by its express terms.

26  //

27  //

28  //

United States District Court
Northern District of California

#### 4.      Application to Facts

In line with the persuasive opinions addressing analogous claims in this district, the Court holds that Plaintiffs' claims based on their kickback and backdating theories are not preempted.[5]

#### a.      Kickback Theory

Wells Fargo asserts that the claims brought under the kickback theory will interfere with its ability to receive any commissions related to the force-placement of insurance.  Wells Fargo Motion, 13; Wells Fargo Reply, 8.  In support of this argument, Wells Fargo notes only that Plaintiffs seek, in their prayer for relief, an injunction prohibiting it from receiving any "so-called 'commissions' or other compensation" in connection with the force-placement of insurance coverage.  *See* Complaint, ¶ 132(j).  The Court recognizes the breadth of the prayer for relief.  But the Court does not now decide whether certain remedies would give rise to NBA preemption.  Rather, the Courts concern is whether the claims raised in the Complaint are preempted.  *See Gutierrez*, 704 F.3d at 727-28 (affirming district court's ruling that the plaintiff's claim for violation of the fraudulent prong of the UCL was not preempted by the NBA, and that pursuant to that claim the district court may provide injunctive relief and restitution, but cautioning that certain injunctions would be so invasive as to be preempted by the NBA).

The Court construes the allegations in the Complaint as follows:  Plaintiffs are seeking to enforce the terms and covenants agreed to by the parties by challenging Wells Fargo's alleged practice of arranging for kickbacks in return for force-placing insurance policies.  *See Lane*, 2013 WL 269133, at *13; *Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *10.  Accordingly, as in *Ellsworth* and *Lane*, the challenged activity, Wells Fargo's selection of an insurance provider, is wholly distinct from its price setting.  Indeed, the NFIA, not state law, limits any fee Wells Fargo can charge related to the force-placement of insurance to the costs it incurred in purchasing the insurance.  *See* 42 U.S.C. § 4012a(e)(2).  Moreover, as the courts in *Ellsworth* and *Lane* noted, Wells Fargo has not identified any reason why it could not agree, by contract, to limit its discretion in areas protected by the NBA.

---

[5] In its Reply, Wells Fargo notes allegations in the Complaint asserting that the fees it charged were excessive because they were not commensurate with the services performed.  Wells Fargo Reply, 9 (citing Complaint, ¶¶ 44, 69(c)).
Notably, Wells Fargo takes paragraph 44 out of context.  That paragraph simply alleges that the "commissions" QBE paid to WFI were simple kickbacks, it does not discuss fees charged to customers.  In any event, the grist of Plaintiffs' claim is that Wells Fargo improperly received kickbacks and backdated insurance policies.

1    *See Lane*, 2013 WL 269133, at *13; *Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *9.  Plaintiffs'

2    kickback theory is not preempted by the NBA.

3                  **b.       The Backdating Theory**

4              As to the backdating theory, Wells Fargo raises the additional argument that Plaintiffs' claims

5    interfere with their ability to obtain collateral protection insurance.  Wells Fargo Reply, 8; 12 C.F.R. §

6    34.4(a)(2).[6]  In *Ellsworth*, the court rejected the same argument, concluding that the backdating

7    practice was not clearly authorized by federal law.  *Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at

8    *12.  As discussed above, the Court agrees that the NFIA did not require, nor did it expressly permit,

9    the backdating practices at issue here.  Once again, as noted in both *Ellsworth* and *Lane*, Wells Fargo

10   has not identified any reason why it could not contractually limit its discretion in areas protected by

11   the NBA.  Plaintiffs' claim is that WFB, the lender, did just that, contractually limiting its discretion

12   such that the backdated force-placement practices at issue here were a breach of contract or a breach

13   of the covenant of good faith and fair dealing.   Accordingly, the backdating theory is not preempted

14   by the NBA.

15         **C.       The Filed-Rate Doctrine and the California Insurance Code**

16             As discussed below, the Court concludes that the kickback allegations are not barred by the

17   California Insurance Code or the filed-rate doctrine.[7]

18                  **1.       Background Law**

19             California law requires property and casualty insurance premiums, including flood insurance,

20   to be approved by the commissioner of the California Department of Insurance prior their use.  *See*

21   Cal. Ins. Code § 1861.01(c).  "No rate shall be approved or remain in effect which is excessive,

22   inadequate, unfairly discriminatory or otherwise in violation of this chapter."  Cal. Ins. Code §

23   1861.05(a).  Members of the public can challenge rates both before and after approval in

24   administrative proceedings from which judicial review is available.  *See* Cal. Ins. Code §§ 1858,

25

26

---

[6] To the extent Wells Fargo relies on theories discussed pertaining to kickbacks in arguing that the backdating theory is
preempted, those arguments are rejected for the same reasons.  Plaintiffs are not challenging Wells Fargo's fee setting with
respect to their backdating theory.  They are challenging that the insurance was placed at all.

[7] Defendants do not raise these defenses as a bar to the backdating claims.  In any event, the defenses do not bar the
backdating claims because those claims challenge the placement of insurance in any amount, regardless of pricing.

United States District Court
Northern District of California

1858.6, 1861.05(c).  Once an insurance rate is approved, an insurer must charge the approved rates or face substantial penalties.  Cal. Ins. Code §§ 1858.07(a), 1861.07(c).

Section 1860.1 of the California Insurance Code provides:  "No act done, action taken or agreement made pursuant to the authority conferred by this chapter shall constitute a violation of or grounds for prosecution or civil proceedings under any other law of this State heretofore or hereafter enacted which does not specifically refer to insurance."  On the other hand, section 1861.03(a) provides:  "The business of insurance shall be subject to the laws of California applicable to any other business including, but not limited to, the Unruh Civil Rights Act…, and the antitrust and unfair business practices laws…"

Recognizing "this apparent contradiction," the California Court of Appeal has "harmonize[d]" the statutes by holding:

> (1)  while Insurance Code section 1861.03 subjects the entirety of the business of insurance to the laws governing business generally; and (2) Insurance Code sections 1860.2 and 1861.03 taken together provide that the statutes in the ratemaking chapter of the Insurance Code may be enforced by the laws governing business generally (if applicable); nonetheless, (3) Insurance Code section 1860.1 exempts from other California laws acts done and actions taken pursuant to the ratemaking authority conferred by the ratemaking chapter, *including the charging of a preapproved rate*.

*MacKay*, 188 Cal.App.4th at 1442-43, 115 Cal.Rptr.3d 893 (emphasis in original).  Thus, "Insurance Code section 1860.1 precludes a challenge to an approved rate brought under laws outside the Insurance Code."  *Id.* at 1448; *see also Walker v. Allstate Indem. Co.*, 77 Cal.App.4th 750, 756, 92 Cal.Rptr.2d 132 (2000) ("If section 1860.1 has any meaning whatsoever (which under the accepted rules of statutory construction it must), the section must bar claims based upon an insurer's charging a rate that has been approved by the commissioner pursuant to the amended McBride Act").  However, "Insurance Code section 1860.1 protects from prosecution under laws outside the Insurance Code only acts done, actions taken and agreements made pursuant to the authority conferred by the ratemaking chapter."  *MacKay*, 188 Cal.App.4th at 1449 (quotations omitted).

As to the filed-rate doctrine, California Courts of Appeal have disagreed over whether California recognizes such a doctrine to preclude challenges to rates filed pursuant to the Insurance Code.  *Compare Fogel v. Farmers Group, Inc.*, 160 Cal.App.4th 1403, 1418, 74 Cal.Rptr.3d 61

United States District Court
Northern District of California

United States District Court
Northern District of California

1   (2008) (refusing to apply federal filed rate doctrine in the context of an insurance rate approved by a

2   state regulatory agency); *Walker*, 77 Cal.App.4th at 757 n.4, 92 Cal.Rptr.2d 132 (stating that its

3   holding, based on statutory construction, is consistent with the federal filed rate doctrine to the extent

4   that the doctrine is relevant at all); to *MacKay*, 188 Cal.App.4th at 1448-49, 115 Cal.Rptr.3d 893

5   (relying on out of state precedent and *Walker* to expressly disagree with *Fogel* and hold that the filed-

6   rate doctrine applies to California insurance rates).  To the extent California courts recognize such a

7   doctrine in this context, "[t]he filed rate doctrine provides that rates duly adopted by a regulatory

8   agency are not subject to collateral attack in court."  *MacKay*, 118 Cal.App.4th at 1448, 115

9   Cal.Rptr.3d 893.  In *MacKay*, the court held that "the filed rate doctrine supports our conclusion[,]"

10  reached by way of statutory construction as described above, "that there is no tort liability for

11  charging a rate that has been approved by the commissioner."  *Id.* at 1449.

## 2.   Application to Facts

13      Neither the filed-rate doctrine nor the California Insurance Code bars the kickback allegations

14  against Wells Fargo, even assuming those protections could apply.  Plaintiffs' kickback claims against

15  Wells Fargo boil down to an attack on Wells Fargo's decision to purchase insurance from QBE as

16  opposed to any other insurer from which it could have obtained a more favorable rate.  *See* Complaint,

17  ¶ 48 (premiums on QBE policy substantially exceeded premiums charged by other insurers).  The

18  challenge is not to the lawfulness of QBE's rate – but to Wells Fargo's decision to choose QBE in

19  order to obtain a kickback.  *See Cannon*, __ F.Supp.2d __, 2013 WL 132450, at *9 ("if insurance

20  were available from a number of carriers at different rates – all subject to filed-rates – the filed-rate

21  doctrine would not protect a loan servicer who chooses a carrier and a policy with a rate higher than

22  others simply to receive a kickback not available from other carriers").  Because Plaintiffs are not

23  challenging QBE's rate in making their claim against Wells Fargo, the filed-rate doctrine and the

24  relevant provisions of the California Insurance Code are inapplicable.[8]

25      For similar reasons, the filed-rate doctrine and the California Insurance Code do not bar the

26  allegations against QBE.  This is a closer question, as one reading of Plaintiffs' Complaint would

27  likely be subject to the filed-rate doctrine.  That is, should the Complaint be construed as setting forth

---

28  [8] In light of this holding, the Court need not address whether a defendant that does not itself file rates and is not itself an insurer can ever raise these defenses.  *See* Opposition to Wells Fargo, 23.

1   the theory that Plaintiffs were harmed by payment of QBE's premiums because those premiums were

2   improperly inflated by the commissions it paid to Wells Fargo, then the Complaint would be a

3   challenge to the charged rate as excessive asking the Court to calculate an alternative it deems more

4   fair. *See Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *13 (stating that the insurance code

5   would protect an insurance provider from such a challenge).

6       The causes of action asserted against QBE in the Complaint cannot be read to rely on that

7   theory.  Both claims rely on QBE's manipulation of the force-placement process, which, as to the

8   kickback theory, is described as "[o]ffering Wells Fargo and other mortgage lenders/servicers and/or

9   their affiliates kickbacks or so-called 'commissions' in connection with force-placed flood insurance

10  … to gain their business and secure premium payments that [QBE] would not otherwise have

11  received."  Complaint, ¶ 102; *see also*, Complaint, ¶¶ 103, 126.  Put another way, Plaintiffs' theory is

12  that QBE secured business that would otherwise have gone to other insurers by offering Wells Fargo,

13  among others, kickbacks.  As a result, Wells Fargo chose to purchase insurance policies from QBE.

14  As with Plaintiffs' claim against Wells Fargo, this does not amount to a challenge to QBE's rate but to

15  a challenge to QBE's manipulation of Wells Fargo's purchasing decision.  "Just because the damages

16  are based on increased costs incurred as a result of the alleged kickback scheme does not transform a

17  challenge to conduct and practices into a challenge to premiums."  *Ellsworth*, __ F.Supp.2d __, 2012

18  WL 6176905, at *14.  The filed-rate doctrine and the California Insurance Code do not bar Plaintiffs'

19  claims against QBE. [9]

20      **D.   Breach of Contract and Implied Covenant of Good Faith and Fair Dealing**

21      As explained below, Wells Fargo's Motion to Dismiss the breach of contract and implied

22  covenant claims against WFB is denied.

23          **1.   Background Law**

24      The elements of a cause of action for breach of contract in California are:  (1) the existence of

25  the contract; (2) performance by the plaintiff or excuse for nonperformance; (3) breach by defendant;

26  and (4) damages.  *First Commercial Mortg. Co. v. Reece*, 89 Cal.App.4th 731, 745, 108 Cal.Rptr.2d

27  23 (2001).  "There is implied in every contract a covenant by each party not to do anything which will

28  _____
[9] Because the filed-rate doctrine would not bar Plaintiffs' claims, the Court does not resolve whether California recognizes such a doctrine in this context.

deprive the other parties thereto of the benefits of the contract." *Harm v. Frasher*, 181 Cal.App.2d 405, 417, 5 Cal.Rptr. 367 (1960).  A breach of contract may be established on the basis of either an express provision of the contract or on the implied covenant of good faith and fair dealing.  *See Storek & Storek, Inc. v. Citicorp Real Estate, Inc.*, 100 Cal.App.4th 44, 55, 122 Cal.Rptr.2d 267 (2002) ("every contract imposes upon each party a duty of good faith and fair dealing in the performance of the contract such that neither party shall do anything which will have the effect of destroying or injuring the right of either party to receive the fruits of the contract").  An implied covenant of good faith and fair dealing cannot contradict the express terms of a contract.  *Id.* (citing *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal.4th 342, 374, 6 Cal.Rptr.2d 467, 826 P.2d 710 (1992)).  Further, because "the implied covenant operates to protect the express covenants or promises of [a] contract … [it] cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of [the parties'] agreement."  *McClain v. Octagon Plaza, LLC*, 159 Cal.App.4th 784, 805, 71 Cal.Rptr.3d 885 (2008).

"Facts alleging a breach, like all essential elements of a breach of contract cause of action, must be pleaded with specifity."  *Levy v. State Farm Mut. Auto. Ins. Co.*, 150 Cal.App.4th 1, 5, 58 Cal.Rptr.3d 54 (2007).  Thus, to state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must identify the specific contractual provision that was frustrated.  *See Lingad v. Indymac Fed. Bank*, 682 F.Supp.2d 1142, 1154 (E.D. Cal. 2010).

A court may resolve contractual claims on a motion to dismiss if the terms of the contract are unambiguous.  *Barrous v. BP P.L.C.*, 2010 WL 4024774, at *4 (N.D. Cal. Oct. 13, 2010).  By contrast, what the parties intended by an ambiguous contract is a factual determination.  *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991).  Thus, "[w]here the language 'leaves doubt as to the parties' intent,' the motion to dismiss must be denied."  *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F.Supp.2d 1034, 1040 (C.D. Cal. 2008) (quoting *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986); *see also Trustees of Screen Actors Guild-Producers Pension and Health Plans v. NYCA, Inc.*, 572 F.3d 771, 777 (9th Cir. 2009)).

//

//

2.      **Application to Facts**

a.      **Breach of an Express Provision**

Plaintiffs' alleged contract with WFB is the DOT.  In relevant parts, the DOT provides:

Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.

…

If borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.

…

If … Borrower fails to perform the covenants and agreements contained in this security instrument … then Lender may do and pay whatever is *reasonable or appropriate* to protect Lender's interest in the Property…

Complaint, Ex. 1, ¶¶ 5, 9 (emphasis added).

Recent decisions in this district have held that plaintiffs that make substantially the same kickback and backdating claims made here stated a claim for breach of almost identical contract provisions.  *Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *15-*16; *McNeary-Calloway*, 863 F.Supp.2d at 955-56 (force-placed hazard insurance); *Lane*, 2013 WL 269133, at *9-*10 (kickback only); *Lane II*, 2013 WL 1758878, at *2-*4 (backdating only).

This Court follows *Ellsworth*, *Lane*, and *McNeary-Calloway* in concluding that Plaintiffs have stated a claim on the kickback theory.  In both *Ellsworth* and *McNeary-Calloway*, the courts reasoned that almost identical language did not unambiguously authorize kickbacks or backdating, and that paragraph nine "could be interpreted as explicitly restricting the lender's discretion in force-placing insurance."  *See Ellsworth*, __ F.Supp.2d __, 2012 WL 6176905, at *16 (quoting *McNeary-Calloway*,

863 F.Supp.2d at 956 and agreeing with its analysis).[10] This Court sees no reason to part with their analysis. The relevant contract terms are ambiguous. The Court cannot say as a matter of law that WFB has not breached those terms by exceeding the scope of its discretion, which is broad, as noted in *McNeary-Calloway*, by receiving kickbacks on force-placed flood insurance in return for choosing to purchase policies from QBE.

WFB argues that the kickback theory is flawed because it relies only on the lack of express authorization in the contract, and thus asks the Court to read into the DOT a categorical ban on the receipt of commissions. Wells Fargo Motion, 8. The Court's holding is not so broad. At this early stage in the litigation, the Court holds only that the ambiguous contract can be read to limit WFB's discretion to preclude the alleged kickback scheme. *See Lane*, 2013 WL 269133, at *10 ("Self-dealing by Wells Fargo in the procurement of insurance … may exceed the authorization and discretion provided by the parties' agreement").

The Court follows *Ellsworth*, *McNeary-Calloway*, and *Lane II* in concluding that Plaintiffs have also stated a claim on the backdating theory. The reasoning above pertaining to the kickback theory is equally applicable here. However, WFB raises additional arguments attacking the backdating theory. First, WFB argues that the alleged backdating practices were consistent with and authorized by its contractual right to ensure continuous coverage to protect its collateral. Wells Fargo Motion, 5-6. But WFB points to, and the Court finds, no such unambiguous provision in the contract.[11]

Second, WFB argues that the theory is improperly premised on the contention that backdated insurance policies are worthless because they provide coverage during a time period in which no loss occurred. Wells Fargo Motion, 7; *see also* Complaint, ¶ 24. WFB asserts that it nevertheless properly placed the policies because there was no way it, as a national lender, can be aware of any damage that occurred on the property during that period. Wells Fargo Motion, 7. WFB states that the backdated

---

[10] The DOT in *McNeary-Calloway* provided Lender with discretion to pay only for "whatever is necessary," as opposed to "whatever is reasonable and appropriate," as is the case here and was the case in *Ellsworth*.

[11] Wells Fargo worries that it will not be able to vindicate its rights under the contract to continuous coverage without placing backdated policies. Wells Fargo Reply, 20. In the case at hand, WFB waited over two years before it began seeking to place backdated policies. Complaint, ¶ 24. At this juncture, the Court cannot say, as a matter of law, that WFB would be unable to obtain continuous insurance coverage through a greater exercise of diligence as opposed to the placement of policies covering expired time periods.

1    insurance policies will provide coverage against such damage, as well as latent damage caused during

2    the coverage period and therefore has value.  Wells Fargo Reply, 2.  These assertions go beyond the

3    allegations made in the Complaint.  In essence, WFB asks the Court to conclude, in light of these

4    factual considerations, it acted within the discretion under the contract.  This factual inquiry is

5    improper in the context of a motion to dismiss.

6           Third, WFB argues that its practices cannot be challenged because they comply with the

7    NFIA.  In *Lane II*, the court performed a detailed analysis in rejecting the same arguments WFB

8    presses here.  First, the court noted that the relevant statutory provision prohibited lenders from

9    issuing loans for any property unless flood insurance is in place "for the term of the loan."  *Lane II*,

10   2013 WL 1758878, at *2 (quoting 42 U.S.C. 4012a(b)(1)(A)).  The court reasoned that the plain

11   language of the statute did not require backdating force-placed insurance and charging borrowers the

12   increased cost.  *Id*.  Therefore, it refused to dismiss the claims brought under the backdating theory.

13   *Id*. at *3.  The court also noted that the language did not appear in the section permitting force-placed

14   insurance.  *Id*. at *2.  As such, the court concluded that the statute could not be reasonably read to

15   have required backdating of force-placed insurance.  *Id*.  The court found that its conclusion was

16   supported by administrative guidance from the OCC, which stated that a servicer may charge a

17   borrower for expired insurance during the notice period "if the borrower has given … its servicer

18   express authority to charge the borrower for such coverage as a contractual condition of the loan being

19   made."  *Id*.  In *Lane II*, no such express permission had been given.  *Id*.

20          The court in *Lane II* rejected as unpersuasive WFB's arguments relying on legislative history

21   of the amended version of the statute, which now appears to allow servicers to engage in the

22   challenged backdating practices.  *Id*. at *3.  Wells Fargo argued that the legislative history indicates

23   that the statute merely clarifies preexisting law, citing House Report No. 112-102 (2011).  *Id*.  The

24   court found that the House Report was worthy of little weight, as it was part of a different bill that

25   never passed the Senate and never became law.  *Id*.  In addition, Wells Fargo cited a comment from

26   the Consumer Financial Protection Bureau permitting retroactive force-placement of hazard insurance

27   policies.  *Id*. (citing Mortgage Servicing Rules, 78 Fed. Reg. 10696, 10891-92 (Feb. 14, 2013)).  The

28

1   court noted that the comment does not go into effect until January 2014 and rejected the notion that

2   the comment clarified existing law.  *Id.*

3           Fourth, WFB cites three district court decisions reading mortgage agreements to permit

4   charging borrowers for backdated force-placed flood insurance.  Again, the court in *Lane II* rejected

5   the same argument pressed here.  *Id.* (distinguishing *Webb*, 2008 WL 2230696, at *6, as it was

6   decided on summary judgment, distinguishing *LaCroix v. U.S. Bank, N.A.*, 2012 WL 2357602, at *5,

7   (D. Minn. June 20, 2012), *appeal dismissed* (Oct. 16, 2012), because it relied on *Webb* and the

8   plaintiff's failure to show an intent to deceive, a required element under Connecticut law, and

9   disagreeing with *Schilke*, 820 F.Supp.2d at 834, while collecting cases that have done so).  The court

10  reiterated that the dispute as to the interpretation of the mortgage language rendered a determination

11  of the issue on a motion to dismiss inappropriate.  *Id.*

12          This Court agrees with and adopts the *Lane II* court's analysis of WFB's third and fourth

13  arguments.  Accordingly, Plaintiffs have stated a claim for breach of contract against WFB on both

14  their kickback and their backdating theories.

15                          **b.       Breach of the Implied Covenant**

16          "The covenant of good faith finds particular application in situations where one party is

17  invested with a discretionary power affecting the rights of another.  Such power must be exercised in

18  good faith."  *Carma*, 2 Cal.4th at 372, 6 Cal.Rptr.2d 467, 826 P.2d 710; *see Perdue v. Crocker Nat'l

19  Bank*, 38 Cal.3d 913, 923, 216 Cal.Rptr. 345, 702 P.2d 503 (1985) ("Where a contract confers on one

20  party a discretionary power affecting the rights of the other, a duty is imposed to exercise that

21  discretion in good faith and in accordance with fair dealing") (internal quotations omitted).  "The

22  exercise of discretionary powers is exercised under the implied covenant to assure that the promises of

23  the contract are effective and in accordance with the parties' legitimate expectations."  *Ellsworth*, __

24  F.2d __, 2012 WL 6176905, at *17 (quoting *McNeary-Calloway*, 863 F.Supp.2d at 956-57); *see

25  Carma*, 2 Cal.4th at 373-74, 6 Cal.Rptr.d 467, 826 P.2d 710; *Gabana Gulf Distrib., Ltd. v. GAP Int'l

26  Sales, Inc.*, 2008 WL 111223, at *8 (N.D. Cal. Jan. 9, 2008); *Schwarzkopf v. Int'l Bus. Machs., Inc.*,

27  2010 WL 1929625, at *13 (N.D. Cal. May 12, 2010).  However, the covenant does not "prohibit a

28  party from doing that which is expressly permitted by an agreement.  On the contrary, as a general

United States District Court
Northern District of California

34

1   matter, implied terms should never be read to vary express terms." *Carma*, 2 Cal.4th at 374, 6

2   Cal.Rptr.2d 467, 826 P.2d 710.

3          Plaintiffs allege that WFB improperly exercised its purported discretion to force-place flood

4   insurance under both the backdating and kickback theories. Complaint, ¶ 85. Following *Ellsworth*

5   and *McNeary-Calloway*, the Court concludes that Plaintiffs have stated a claim for breach of the

6   covenant of good faith and fair dealing. In *Ellsworth*, the court adopted the following reasoning from

7   *McNeary-Calloway*:

> the implied covenant governs Defendants' discretion in force-placing insurance. Although
> Defendants have the right to set the scope and extent of hazard insurance coverage – and
> explicitly warn that FPI may be "significantly" more expensive than coverage on the open
> market – the Plaintiffs here have stated a claim under the implied covenant that Defendants
> abused this discretion by acting in bad faith and outside the reasonable expectations of the
> parties. Whether Defendants' acts were done in bad faith and not within the reasonable
> expectations of the parties is a question of fact that cannot be decided at the pleading stage.

13  *Ellsworth*, __ F.2d __, 2012 WL 6176905, at *18 (quoting *McNeary-Calloway*, 863 F.Supp.2d at

14  958). That reasoning applies equally in this case. *See* Complaint, ¶¶ 85-86 (alleging Defendants

15  abused their discretion under the contract by engaging in the alleged conduct in bad faith). Wells

16  Fargo's Motion to Dismiss Plaintiffs' breach of contract and breach of the covenant of good faith and

17  fair dealing claims is denied.

18      **E.      Violation of the UCL**

19          **1.      Background Law**

20              **a.      Standing**

21          A claim for unfair competition under the UCL may be brought "by a person who has suffered

22  injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof.

23  Code § 17204. Therefore, to establish standing under the UCL a plaintiff must "(1) establish a loss or

24  deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury*, and (2)

25  show that that economic injury was the result of, i.e., *caused by*, the unfair business practice … that is

26  the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal.4th 310, 337, 120 Cal.Rptr.3d

27  741, 246 P.3d 877 (2011).

28

United States District Court
Northern District of California

35

### b.      UCL Violation

The UCL prohibits "unfair competition," which is defined as any "unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  To establish a violation of the UCL, a plaintiff may establish a violation under any one of these prongs.  Here, Plaintiffs rely entirely on the "unfair" prong.

While there is disagreement among California courts regarding the definition of "unfair" business practices, three tests have been applied, as the court in *Phipps v. Wells Fargo* explains:

> In consumer cases, such as this, the California Supreme Court has not established a definitive test to determine whether a business practice is unfair.  *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal.App.4th 247, 256, 106 Cal.Rptr.3d 46 (2010).  A split of authority has developed among the California Courts of Appeal, which have applied three tests for unfairness in consumer cases.  *Drum*, 182 Cal.App.4th at 256, 106 Cal.Rptr.3d 46.
>
> The test applied in one line of cases requires "that the public policy which is a predicate to a consumer unfair competition action under the 'unfair' prong of the UCL must be tethered to specific constitutional, statutory, or regulatory provisions."  *Drum*, 182 Cal.App.4th at 256, 106 Cal.Rptr.3d 46 (citing *Bardin v. Daimlerchrysler Corp.*, 136 Cal.App.4th 1255, 1260–1261, 39 Cal.Rptr.3d 634 (2006); *Davis v. Ford Motor Credit Co.*, 179 Cal.App.4th at 581, 595–596, 101 Cal.Rptr.3d 697 (2009); *Gregory v. Albertson's Inc.*, 104 Cal.App.4th 845, 854, 128 Cal.Rptr.2d 389 (2002).
> . . .
> A second line of cases applies a test to determine whether the alleged business practice "is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim."  *Drum*, 182 Cal.App.4th at 257, 106 Cal.Rptr.3d 46 (citing *Bardin*, 136 Cal.App.4th at 1260, 39 Cal.Rptr.3d 634; *Davis*, 179 Cal.App.4th at 594–595, 101 Cal.Rptr.3d 697)).
> . . .
> The test applied in a third line of cases draws on the definition of "unfair" in section 5 of the Federal Trade Commission Act (15 U.S.C. § 45, subd. (n)), and requires that "(1) the consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided."  *Drum*, 182 Cal.App.4th at 257, 106 Cal.Rptr.3d 46 (citing *Davis*, 179 Cal.App.4th 597–598, 101 Cal.Rptr.3d 697; *Camacho v. Automobile Club of S. Cal.*, 142 Cal.App.4th 1394, 1403, 48 Cal.Rptr.3d 770 (2006)).

2011 WL 302803, at *16 (E.D. Cal. Jan. 27, 2011).

//

//

United States District Court
Northern District of California

### 2.    Application to Facts

Plaintiffs bring causes of action pursuant to the UCL under the "unfair" prong against all Defendants.  Defendants argue that Plaintiffs lack standing and that they have failed to state a claim under any of the three tests for unfairness.

Plaintiffs have sufficiently alleged standing.  Plaintiffs allege that they paid increased insurance premiums as a result of Defendants' scheme through which Wells Fargo purchased force-placed insurance policies from QBE, as opposed to other insurance carriers, because QBE provided a kickback to Wells Fargo.  Further, Plaintiffs allege that they paid wholly inappropriate insurance premiums as a result of Defendants' scheme to force-place backdated insurance policies.  Plaintiffs have sufficiently pled economic injury.

Because the Court cannot say, as a matter of law, that Defendants alleged conduct would not violate any of the three tests for unfair conduct, Defendants' Motions to Dismiss the UCL claim are denied.

### F.    Unjust Enrichment/Restitution

#### 1.    Background Law

Although there is some disagreement among California courts as to whether unjust enrichment may be asserted as a stand-alone claim under California law, this Court has held that a claim for unjust enrichment can properly be understood as one for restitution, which is recognized under California law.  *McNeary-Calloway*, 863 F.Supp.2d at 963-64 (citing *Nordberg*, 445 F.Supp.2d at 1100).

To state a claim for restitution, a plaintiff "must plead 'receipt of a benefit and the unjust retention of the benefit at the expense of another.'"  *Walters v. Fidelity Mortg. of Cal.*, 2010 WL 1493131, at *12 (E.D. Cal. Apr. 14, 2010) (quoting *Lectrodryer v. SeoulBank*, 77 Cal.App.4th 723, 726, 91 Cal.Rptr.2d 881 (2000)).  "Even when a person has received a benefit from another, he is required to make restitution 'only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.'"  *Ghirardo v. Antonioli*, 14 Cal.4th 39, 51, 57 Cal.Rptr.2d 687, 924 P.2d 996 (1996) (quoting Restatement of Restitution, § 1, cmt. c).  To prevail on a claim for restitution, a plaintiff need not establish bad faith on the part of the defendant, so long

1   as the recipient of the funds was not entitled to the funds.  *See Lectrodryer*, 77 Cal.App.4th at 726, 91

2   Cal.Rptr.2d 881.

3                    **2.        Application to Facts**

4            Plaintiffs assert restitution claims against WFI and QBE.  Plaintiffs have no contract with any

5   of those parties.  Plaintiffs have pled that WFI and QBE unjustly received and retained a benefit from

6   Plaintiffs in the form of they insurance premiums Plaintiffs paid.  Complaint, ¶¶ 111, 113, 123-26.

7   The Court follows *Lane*, *Ellsworth*, and *McNeary-Calloway*, in allowing Plaintiffs' to proceed on

8   their unjust enrichment claims.  *See Lane*, 2013 WL 269133, at *10-*11; *Ellsworth*, __ F.Supp.2d __,

9   2012 WL 6176905, at *18-*19; *McNeary-Calloway*, 863 F.Supp.2d at 964.

10           Defendants argue that Plaintiffs' restitution claim should be barred because restitutionary

11  relief is provided for by their UCL cause of action.  "[A]lthough plaintiffs' restitution claim … may

12  ultimately be superfluous to their restitution claim under section 17200, it is inappropriate at the

13  motion to dismiss stage to make that determination, as plaintiffs may prevail in one cause of action

14  but not in the other."  *Nordberg*, 445 F.Supp.2d at 1101.  In line with the numerous closely analogous

15  cases allowing both UCL and restitution claims to proceed on backdating and kickback theories,

16  Defendants' Motions to Dismiss the restitution claims are denied.

17           **G.      Motions to Strike Request for Exemplary Damages**

18           Plaintiffs seek exemplary damages in connection with their restitution claims against WFI and

19  QBE.  *See* Complaint, ¶¶ 121, 131, 132(m).   WFI and QBE move to strike Plaintiffs' request for

20  exemplary damages.  WFI and QBE argue that Plaintiffs have not alleged conduct that would entitle

21  them to punitive damages.[12]

22           Under Rule 12(f) of the Federal Rules of Civil Procedure, the court may strike from any

23  pleading "any insufficient defense or any redundant, immaterial, impertinent or scandalous matter."

24  Motions to strike are generally disfavored.  5C Charles Alan Wright & Arthur R. Miller, Federal

25  Practice and Procedure § 1380 (3d ed. 2004). "The function of a 12(f) motion to strike is to avoid the

26  expenditure of time and money that must arise from litigating spurious issues by dispensing with

27

28  ───────────────────
    [12] Defendants cite no authority to contradict Plaintiffs' assertion that exemplary damages are available pursuant to a claim
    for unjust enrichment/restitution.

those issues prior to trial …" *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (internal quotations omitted; citations omitted).

In *Whittlestone*, the Ninth Circuit reviewed a district court decision striking a plaintiff's claim for lost profits and consequential damages from plaintiff's complaint pursuant to Rule 12(f). *Whittlestone*, 618 F.3d at 973. The Ninth Circuit concluded that the claim for lost profits and consequential damages was not properly the subject of a motion to strike because the claim was not (1) an insufficient defense; (2) redundant; (3) immaterial; (4) impertinent; or (5) scandalous. *Id*. at 973-74. The court went on to reject the defendant's argument that the claim should be stricken from the complaint as precluded as a matter of law. *Id*. at 974. The Ninth Circuit explained that an attempt to dismiss a portion of the plaintiff's complaint is better suited to a 12(b)(6) motion. *Id*. It reasoned that if Rule 12(f) were allowed to be used to dismiss some or all of a pleading, it would create redundancies with Rule 12(b)(6). *Id*. Therefore, the Ninth Circuit held that Rule 12(f) does not authorize district courts to strike claims for damages on the ground that such claims are precluded as a matter of law. *Id*. at 974-75. Accordingly, the Court denies Defendants' Motion to Strike as to Plaintiffs' request for punitive damages.

**V.     CONCLUSION**

For the foregoing reasons, Defendants Motions are denied.

IT IS SO ORDERED.

Dated: June 19, 2013

_____

JOSEPH C. SPERO
United States Magistrate Judge

United States District Court
Northern District of California

39